Jean–Pierre MINDOMBE, Appellant,

v.

UNITED STATES, Appellee.

No. 97–CF–1071.

District of Columbia Court of Appeals.

Argued Oct. 19, 2000.
Decided March 28, 2002.

Robert S. Becker, appointed by the court, for appellant.

Luis A. Lopez, Assistant United States Attorney, with whom Wilma A. Lewis, United States Attorney at the time the brief was filed, and John R. Fisher, and Thomas J. Tourish, Jr., Assistant United States Attorneys, were on the brief, for appellee.

Before REID and WASHINGTON, Associate Judges, and PRYOR, Senior Judge.

WASHINGTON, Associate Judge:

After a jury trial, appellant, Jean–Pierre Mindombe, was convicted of carnal knowledge,[1] three counts of incest,[2] two counts of first-degree child sexual abuse (vaginal intercourse),[3] taking indecent liberties with a minor as a lesser-included offense of sodomy on a minor,[4] and second-degree child sexual abuse as a lesser-included offense of first-degree child sexual abuse (anal sodomy).[5] Mindombe filed a timely notice of appeal to this court arguing that 1) the trial court abused its discretion by allowing Nancy Davis, Ph.D., to testify as an expert witness; 2) the trial court abused its discretion by limiting Mindombe's cross-examination of Dr. Davis; 3) the trial court abused its discretion by limiting Mindombe's attempt to impeach by omission the complainant's testimony; and 4) there was insufficient evidence to support his convictions. We affirm.

## I.

This appeal is taken from the retrial of a child sexual abuse case which resulted in the conviction of appellant, Jean–Pierre Mindombe, the victim's father. The first trial ended in a mistrial when the jury was unable to reach a unanimous verdict. The facts of this case, as is the norm in cases like this one, are sordid and will not be discussed in great detail in this section.

According to J.M., the victim in this case, Mindombe began sexually abusing her when she was a six or seven-year-old second grader. When the abuse began J.M., along with her mother and siblings, lived with Mindombe in an apartment building located on Rock Creek Ford Road in Northwest Washington, D.C. Although J.M. moved with her mother and siblings to Takoma Park, Maryland, soon after the abuse began, J.M. testified that she would visit her father periodically at the Rock Creek Ford apartment and that he continued to sexually abuse her. She testified about several specific incidents of abuse that involved both the fondling and penetration of her genitalia by Mindombe. According to J.M. Mindombe would use his fingers or his own genitalia.

Despite the several sexual episodes involving Mindombe, J.M. testified that for a long period of time she was scared to report the abuse to her mother but that eventually a "spirit" moved her to do so. At the time of trial J.M. was eight years old.

Among other witnesses, the government presented Dr. Nancy Davis, a clinical psychologist, who provided expert testimony on the range of behaviors exhibited by victims of child sexual abuse, and Dr. Perdita Taylor, who testified that her physical examination of J.M. revealed that she had redness in her labia minora; a separated hymen; and a scar formation on her hymenal rim. Dr. Taylor also testified that

1. D.C.Code § 22–3502 (1996 Repl.).

2. D.C.Code § 22–2801 (1996 Repl.).

3. D.C.Code § 22–4108 (1996 Repl.).

4. D.C.Code § 22–3502 (1996 Repl.).

5. D.C.Code § 22–4108 (1996 Repl.).

J.M. told her that she had been sexually abused by her father.

## II.

### A. Admissibility of Expert Testimony on Child Behavior

Mindombe's primary contention is that the trial court abused its discretion by allowing Dr. Davis to testify as an expert witness as to her observations with respect to the behavior of sexually abused children. Specifically, Dr. Davis testified regarding children's inability to remember events in sequential order, the range of children's reactions to abuse, and their tendency not to report the abuse. Mindombe argues that the testimony of Dr. Davis was not helpful to understanding any contested facts in the present case. Instead, he argues that the testimony was presented only to buttress the credibility of the child-witness by providing expert testimony to fill in gaps in the child's testimony. In addition, Mindombe contends that the introduction of Dr. Davis' testimony was improper due to the fact that before the introduction of the expert testimony, J.M.'s inability to narrate events sequentially was not challenged; her failure to report the alleged abuse was not attacked; and her general demeanor in discussing the allegations was not questioned by defense counsel. Thus, there was no challenge to J.M.'s truthfulness, and Dr. Davis' testimony invaded the province of the jury because it solely bore on issues of the child-witness' credibility.

This is improper, Mindombe argues, because the admission of such testimony is limited to rehabilitative purposes under FED.R.EVID. 608.

### 1. Expert Testimony Improperly Invaded Province of Jury

Mindombe argued to the trial court that Dr. Davis' testimony was inadmissible because information regarding a child's reactions to sexual abuse was not outside the ken of an average lay juror. In response, the government argued that Dr. Davis' testimony regarding the behavior of abused children was information that is not readily within the realm of understanding of a lay person, and therefore, the expert testimony was properly admitted by the trial court.[6]

To be sure, this court has previously recognized that expert testimony involving " 'the behavioral characteristics of child molestation victims,' ... [and] the psychological dynamics of a victim of child sexual abuse' are beyond the ken of the average juror." *Oliver v. United States,* 711 A.2d 70, 73 (D.C.1998) (citations omitted). Because *Oliver* was a case of first impression to this court, we relied on two cases from other jurisdictions in reaching our decision. *See Condon v. Delaware,* 597 A.2d 7 (Del.1991); *State v. Ransom,* 124 Idaho 703, 864 P.2d 149 (1993), *cert. denied,* 510 U.S. 1181, 114 S.Ct. 1227, 127 L.Ed.2d 571 (1994). In *Condon,* the Delaware Supreme Court espoused that:

> appear that his opinion or interference will probably aid the trier in his search for the truth, and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.
>
> Dr. Davis' qualifications to testify on the subject matter and the reasonableness of her opinion are not in dispute in this case.

**6.** The three-part test for admitting expert testimony in our jurisdiction is articulated in *Dyas v. United States,* 376 A.2d 827, 832 (D.C. 1977).

> (1) the subject matter must be so distinctly related to some science, profession, business or occupation as to be beyond the ken of the average layman, (2) the witness must have sufficient skill, knowledge or experience in the field or calling as to make it

It is well within the knowledge of an average juror that any child who has not disclosed the whole truth of a story may in fact be fabricating part of the story. Yet the psychological dynamics of a victim of child sexual abuse ... are generally not within the knowledge of the average juror.

597 A.2d at 14. Similarly, in *Ransom*, the Idaho Supreme Court deemed this type of expert testimony helpful because "knowledge of common characteristics of sexually abused children gained from behavioral research very well may aid a jury in weighing the testimony and determining the credibility of the alleged victim." 124 Idaho at 710, 864 P.2d at 157. This court has likewise acknowledged the admissibility and usefulness of expert testimony with respect to the battered women's syndrome in *Nixon v. United States*, 728 A.2d 582, 584 (D.C.1999), "to explain the conduct of the complaining witness in response to the alleged battering." In *Nixon*, Judge Schwelb poignantly articulated the following as to the helpfulness of this type of expert testimony:

Actions sometimes speak louder than words, and a lay juror might well wonder whether [the victim's] actions (and inaction) at the time of the alleged abuse were consistent with the narrative which she provided in the courtroom long after the events occurred. [Expert] testimony was designed to apprise the jurors of certain repeated patterns of behavior on the part of many battered women. With that information, the jurors were in a better position to determine whether these patterns of behavior might explain any perceived discrepancy between [the victim's] words and her deeds.

728 A.2d at 590. Certainly, testimony discussing the patterns and behavior of molested children by experts who have researched and worked with victims in this area serves the same useful purpose. Victims should be allowed the "'opportunity to explain to a jury, through a qualified expert, the reasons for conduct which would otherwise be beyond the average juror's understanding.'" *Id.* at 591 (quoting *State v. Ciskie*, 110 Wash.2d 263, 751 P.2d 1165, 1166 (1988)) (other citation omitted).[7]

Although this court and others have approved of the admission of this type of expert testimony, it has not been without limits. Indeed, courts have allowed experts to testify regarding their observations of victims of abuse and the general behavior and conduct of persons belonging to such groups; however, courts have prohibited the introduction of ultimate conclusions by an expert witness as to the truthfulness of a witness, whether the person was in fact abused, and the guilt of the defendant. *See id.* at 592. In *Condon*, the court cautioned that:

Experts in psychological dynamics ... of victims of child sexual abuse are allowed to testify as to general tendencies.... However, while such experts are allowed to explain seemingly inconsistent behavior by victims in general, they are not allowed to provide statistical probabilities of truthfulness nor are they allowed to opine on the truthfulness of a particular complainant.

597 A.2d at 10. Likewise, in *Ransom*, the court expressed that allowing experts "to state opinions as to the witness's credibility, or to vouchsafe for the accuracy of a victim's spontaneous recollection, or inaccuracy thereof, ... might indeed usurp the

---

**7.** The expert testimony in this case also focused on inter-familial child sexual abuse; however, we perceive no difference between the admissibility of similar expert testimony with respect to child sexual abuse generally.

jury's task of determining witness credibility." 124 Idaho at 710, 864 P.2d 149.

■ In this case, Dr. Davis' testimony generally discussed the ability of children to sequence events, her observation that child victims of incest do not always promptly report such abuse, and that children, unlike adults, display a range of responses to abuse, including not visibly reacting. Clearly, Dr. Davis' testimony as to her observations of abused children was in line with the type of evidence deemed admissible by this court in *Oliver* and *Nixon*. In addition, the trial court properly limited Dr. Davis' testimony from making any ultimate conclusions as to whether J.M. was truthful or whether Mindombe had actually committed the crimes with which he was charged, consistent with our prior case law.

### 2. Limited Rehabilitative Purpose

The government insists that this court's decisions in *Oliver* and *Nixon* resolve Mindombe's issue on appeal. However, determining that this type of expert testimony is generally admissible, with the restrictions noted, does not resolve Mindombe's primary contention. As Mindombe's reply brief makes clear, his main argument is not that this expert testimony is generally inadmissible but that such testimony regarding the behavior of children of sexual abuse is credibility evidence that is admissible only to neutralize a specific attack on the child's credibility. Therefore, appellant argues such testimony can only be introduced if the victim's credibility has

been attacked in order to rehabilitate a witness.[8]

As an initial matter, however, it is important to note that Mindombe did not raise this specific challenge to Dr. Davis' testimony to the trial court below. At trial, Mindombe only contested that the evidence was not beyond the ken of the jury. Therefore, we can only review Mindombe's claim that the expert testimony must serve a rehabilitative purpose for plain error. *See Nixon*, 728 A.2d at 588–89.

In support of his argument that such expert testimony is admissible for a rehabilitative purpose only, Mindombe offers *State v. Grecinger*, 569 N.W.2d 189 (Minn. 1997), a case considered by this court in *Nixon*. In *Grecinger*, the Supreme Court of Minnesota held that expert testimony on battered women's syndrome "was admitted in the prosecutions case-in-chief under MINN. R. EVID. 608(a) when it was presented after the alleged victim's credibility had been attacked by the defense during ·its opening statement and during cross-examination...." 569 N.W.2d at 190. In making the determination that such expert testimony had to serve a rehabilitative purpose, the court in *Grecinger* relied upon the California Court of Appeals decision in *People v. Sanchez*, note 9, 208 Cal.App.3d 721, 729, 256 Cal.Rptr. 446, 454 (4 Dist. 1989).

In *Sanchez*, the Court of Appeals of California concluded that because the syndrome testimony admitted in the govern-

---

**8.** Mindombe highlights a portion of the government's brief that he believes concedes that the testimony was offered to buttress the credibility of J.M.

[Dr. Davis' testimony] would aid the trier in his search for the truth. Dr. Davis' testimony gave the jury background information so that it could better judge the demeanor and credibility of J.M. Contrary to appellants

claims, it is of no moment that he may not have challenged J.M.'s failure to promptly report the abuse of her demeanor. These were aspects of the case that the jury would have to consider, whether they were highlighted by the defense or not, and the government's expert testimony gave the jury the necessary information with which it could examine these issues.

ment's case-in-chief "was rehabilitative and thus pertinent to the question of the victim's testimony," "it was unnecessary for the testimony to await the rebuttal stage of trial to be presented." 208 Cal.App.3d. at 736, 256 Cal.Rptr. 446. Therefore, in *Sanchez,* the court held that the evidence was admissible for a rehabilitative purpose only, and because the victim's credibility was attacked on cross-examination, the expert testimony was properly before the court during the prosecution's case-in-chief. *Id.* The court in *Sanchez* also cited to earlier California cases that stood for the same proposition.

Other jurisdictions, however, have concluded that there need not be an attack on the child's credibility before the admission of behavioral evidence by an expert. In *People v. Peterson,* 450 Mich. 349, 537 N.W.2d 857 (1995), the Supreme Court of Michigan held that expert testimony describing behavioral characteristics of sexually abused children may be used to generally explain their common behavior to the jury.[9] The court in *Peterson* specifically relied on reasoning implied from the decisions of three state courts, New Hampshire Supreme Court, the Wyoming Supreme Court and, oddly, the California Court of Appeals.

*Peterson* references language from the New Hampshire Supreme Court's decision in *State v. Chamberlain,* 137 N.H. 414, 628 A.2d 704 (1993). Although not directly addressing the issue of whether such expert testimony must serve a rehabilitative purpose, the court in *Chamberlain* concluded that expert testimony can be "offered to *preempt* or rebut an inference, based on the child victim's actions and behaviors following the alleged abuse, that the child has lied about the abuse." *Id.* at 417, 628 A.2d at 706 (emphasis added). The court in *Chamberlain* recognized that "a jury *may automatically infer* from a child's secrecy, inconsistency, or recantation that the child has fabricated his or her testimony." *Id.,* 137 N.H. at 418, 628 A.2d at 707 (emphasis added).

The *Peterson* court also relies on language from the Wyoming Supreme Court's decision in *Frenzel v. State,* 849 P.2d 741, 749 (Wy.1993), which concluded that syndrome type testimony is "relevant and admissible to dispel myths the public might hold concerning a child sexual abuse victim's post-abuse behavior if that behavior *is an issue in the case.*" *See also Ransom,* 124 Idaho at 710, 864 P.2d 149 (commenting in dicta that "[t]estimony presented solely for jury education or clarification, however, does not impose upon a jury's fact-finding function").

The Supreme Court of Michigan concluded that such expert testimony is admissible during the government's case-in-chief to generally educate the jury about the common behavior of child sexual abuse victims, absent a formal attack on the victim's credibility by defense counsel, in order to "explain[] a victim's specific behavior that might be incorrectly construed by the jury as inconsistent with that of an abuse victim." *Peterson,* 537 N.W.2d at 868. Such jury education by an expert during the prosecution's case-in-chief is warranted by the fact that the child sexual abuse victim will display "behavior traits that may, by their very nature, create confusion in the minds of the jury." *Id.*

---

**9.** The court in *Peterson* went further to conclude that if the defendant raises the issue of the child's credibility, then the expert may testify that the child's particular behavior is consistent with that of a sexually abused child. This holding, we believe, probably goes too far. However, it may have been tempered if the court announced that the child's behavior was not inconsistent with that of sexually abused children, or does not necessarily negate the fact that the child may have been sexually abused.

Thus, the prosecution may present such evidence if "relevant and helpful to generally explain the common postincident behavior of children who are victims of sexual abuse." *Id.* However, the *Peterson* court added the important caveat that such expert testimony may be introduced during the prosecution's case-in-chief

> only if the facts as they develop would raise a question in the minds of the jury regarding the specific behavior. The behavior must be of such a nature that it may potentially be perceived as that which would be inconsistent with a victim of child sexual abuse, i.e., delay in reporting, recantation, accommodating the abuser or secrecy.

*Id.* at 868 n. 12. Thus, the trial court must determine if a particular behavior requires clarification through expert testimony. *Id.*

■ We agree with the general holding in *Peterson* that this type of expert testimony is admissible as part of the government's case-in-chief because it provides a useful profile to the jury of the range of behaviors exhibited by victims of child sexual abuse. Thus, such expert testimony is admissible in cases where the government successfully proffers that the facts and evidence to be presented at trial are likely to be inconsistent with a lay juror's expectations as to how a child sexual abuse victim should respond to such a traumatizing event. As so aptly stated by the court in *Chamberlain:*

> [w]ithout an understanding of the reasons behind these behaviors, a jury *may automatically infer* from a child's secrecy, inconsistency, or recantation that the child has fabricated his or her testimony. Therefore, when a child's actions after an alleged incident of sexual abuse have the potential to lead a jury to conclude that the child is lying, the testimony of a qualified expert may be beneficial to offer an alternative explanation

for the child's specific behavior so that the jury may more accurately judge the credibility of the child victim.

137 N.H. at 418, 628 A.2d at 707. *See also Nixon,* 728 A.2d at 590; *Condon,* 597 A.2d at 9–10 ("because there [are] no eyewitnesses to the alleged molestations ... the major issue in a prosecution for alleged child sexual abuse is usually the credibility of the child").

Mindombe suggests that permitting preemptive use of expert testimony regarding the behavior of child sexual abuse victims is inappropriate because creating an exception to the Rule 608 requirement in child sexual abuse cases is inappropriate because the strength and credibility of an alleged victim's testimony is a critical issue in any criminal proceeding. We believe there is a difference, however, between an adult witness narrating his or her story of abuse and a young child recounting and expressing his or her recollection of abuse. There are special cognitive issues that relate to children who are victims of sexual abuse that usually are not at issue when the witness is an adult. It is those cognitive issues and their impact on the child's testimony that distinguish the child-witness from an adult capable of narrating a cogent and coherent story. An adult is likely to be in a better position to clearly explain behavior which might appear inconsistent with the allegations of abuse.

Although there are glaring differences with respect to the testimony of a child-witness versus an adult witness in sexual abuse cases, our holding is not predicated on this ground alone. Rather, our holding is more generally that we do not interpret the expert testimony offered in this case to be evidence of the child's credibility since the expert neither met nor examined the child, and did not testify about the child's character for truthfulness. The purpose of this type of expert testimony is to educate

jurors about providing a profile of victims of child sexual abuse in a manner that does not seek to bolster the child's testimony or the allegations of abuse. Certainly, it is only fair that jurors are made aware of not only the differences in children's cognitive processes and the resultant impact on their testimony, but also behavior that may be common to abused children. If, in fact, all sexually abused children reacted in the same way, then the evidence to be offered by the expert would have little probative value. However, it is because of the reality that child victims of sexual abuse do have a range of responses to such abuse, and the jury's possible misconception of the same, that this information serves a useful and necessary purpose at trial.

Further, defendants are not unfairly prejudiced by this type of profile evidence. Defense counsel has every opportunity to ensure that the jury is aware that the expert witness is not offering testimony that the child has been abused or vouching for the child's truthfulness on the stand and the trial court, upon request by defense counsel is responsible for making this point clear to the jury.

Based on the foregoing analysis, we believe that reaching the opposite conclusion in this case would be contrary to the interests of justice because requiring a specific, initial attack by the defendant on issues of the child's credibility would result in a tragic strategic game by attorneys. If we were to adopt appellant's argument, a defendant while purposefully not directly attacking the child's credibility during the presentation of evidence, can still exploit the issue of the child's temporally inconsistent testimony, failure to report the abuse, or unexplainable friendly interactions with his or her abuser during closing argument. This possibility, we think, illustrates the dangerousness of disallowing expert testimony for purposes of jury education and

clarification when such is called for by the facts and evidence presented. The end result could be the exclusion of relevant testimony that is capitalized on by defense counsel at a time when the government is precluded from presenting rebuttal testimony, leaving the unexplained misconceptions of the child's behavior and testimony looming with the jury.

The record in this case points out the folly of requiring an open attack on a child's credibility before allowing this type of expert testimony to be preserved. During closing argument, defense counsel pointed out the fact that the child could not remember the time that specific incidents of abuse occurred, the delay in reporting the allegations of abuse, J.M.'s reaction to the abuse, and J.M.'s scattered testimony. She argued at different points in her closing statement:

> [I]f you have one reason to doubt that [J.M.'s] testimony comes from her own memory, you must acquit Mr. Mindombe; one reason to believe that J.M.'s words are something that she heard or was told or was taught, then you must acquit Mr. Mindombe.
>
> So, what evidence has the government brought to you that you can rely on J.M.'s testimony? None, ladies and gentlemen, none. The report that they make such a big deal about, they say happened spontaneously with the spirit moving her, the evidence doesn't support that, ladies and gentlemen ... Does anything [J.M.] said about this report make any sense? ... There is no explanation that makes any sense for why that happened that way except that the report wasn't made the way J.M. now says it was made.
>
> [And] there are more reasons to doubt [J.M.'s] testimony ... that she wasn't taken to the hospital, that the police

weren't called, that there are adult words in what she said, and that she can give long narratives sometimes and then remembers other times like a child, those are all reasons to doubt her credibility. That what she described happened doesn't fit with what the doctors described as the circumstances under which it is normal to be normal are also reasons to doubt the Government's case.

Essentially, as expected from any good attorney, defense counsel pointed out all of the inconsistencies in J.M.'s testimony and attempted to discredit the veracity of her entire testimony. It is for this reason that we conclude, much as the court did in *Peterson* that the admissibility of expert testimony regarding the behavior of abused children is not credibility evidence the admissibility of which is triggered by defense counsel strategy, but is expert testimony designed to educate the jury so that their lay understanding will be informed by appropriate psychological considerations.

### B. Limiting the Scope of Mindombe's Cross–Examination of Dr. Davis

Mindombe also argues on appeal that the trial judge violated his Sixth Amendment rights by improperly curtailing his cross-examination of Dr. Davis when he attempted to examine her regarding the suggestibility of children's memories.

■■■ The trial court is "entrusted with a large measure of discretion to control the introduction of evidence[.]" *Baker v. United States*, 131 U.S.App. D.C. 7, 36, 401 F.2d 958, 987 (1968). Although "the opportunity to cross-examine a witness is a fundamental right, which is guaranteed in a criminal trial through the [C]onfrontation [C]lause of the Sixth Amendment,[]" *Singletary v. United States*, 383 A.2d 1064, 1073 (D.C.1978) (citations omitted), "the extent and scope of cross-examination of a

witness ... is committed to the sound discretion of the trial court." *Morris v. United States*, 389 A.2d 1346, 1352 (D.C. 1978). "[T]he Confrontation Clause guarantees only an *opportunity* for effective cross-examination, not cross-examination in whatever way, and to whatever extent, the defendant might wish." *Kentucky v. Stincer*, 482 U.S. 730, 739, 107 S.Ct. 2658, 96 L.Ed.2d 631 (1987) (internal quotation marks omitted) (citation omitted) (emphasis in original). Furthermore, "once a party has had an opportunity substantially to exercise the right of cross-examination, the extent of further interrogation is within the sound discretion of the trial court and reversal by an appeals court is warranted only where an abuse of discretion leads to prejudice." *Singletary*, 383 A.2d at 1073 (citations omitted).

■■■ In this case, the trial court ruled that Mindombe's questions regarding the concept of the suggestibility of children was beyond the scope of Dr. Davis' direct testimony, and therefore, an impermissible line of questioning on cross-examination. Dr. Davis testified on direct examination specifically about children's fragmented memories, their range of reactions to intra-family sexual abuse, and the possibility that their reports of abuse may be delayed. On cross-examination, Mindombe attempted to question on the growing area of research on suggestibility in children. The trial court expressed that although Dr. Davis may be aware of the debate in the substantive studies on suggestibility, the line of questioning was improper unless it was somehow related to Dr. Davis' testimony on direct. After repeated attempts by Mindombe to question the doctor on suggestibility, the trial court reaffirmed that Dr. Davis did not comment on what factors affect or influence children's memories. A bench conference then ensued after Mindombe tried to question Dr.

Davis on a specific scientific book. At this point, the trial court explained that if there were opinions expressed in the book that contradicted Dr. Davis' testimony on direct, that questioning in that regard would be appropriate. However, the trial court expressed that the book addressed the manner in which the "styles of questioning" children affect their memories, and was beyond the scope of Dr. Davis' direct testimony. The trial court further explained that while Dr. Davis discussed certain aspects of children's memories, any information related generally to the memory of children could not be introduced on cross-examination.

Our review of the record reveals that Dr. Davis' testimony addressed the fact that children have accurate memories, but that they cannot recall events as easily as adults. Dr. Davis testified that it is vital to evaluate the manner in which you ask questions of children, and that it may be necessary to use "memory cues" to access their memories.[10] Arguably, the concept of suggestibility—how children's memories may be influenced by the questions asked of interviewers—is related to Dr. Davis' testimony on direct examination as to children's ability to access their memories. We do not conclude that the trial court abused its discretion, however, because the record reflects that the trial court permitted defense counsel extensive leeway to question Dr. Davis generally as to the suggestibility of children. In fact, the record reflects that defense counsel successfully had Dr. Davis acknowledge that chil-

dren's memories can be manipulated by suggestion, that the concept of suggestibility is a new area of research that is seriously debated, and that a biased interviewer who repeatedly questions a child can be suggestive and "add information that [did not] happen" to that child's memory. In addition, Dr. Davis acknowledge that in reference to cuing a child's memory there may be some concern regarding the impact of inappropriate questions on a child's memory. Finally, Dr. Davis acknowledged that a biased interviewer could impact a child's memory, and that there was no consensus in the psychological community regarding the right way to ask appropriate questions of children to preserve their memories. Here, defense counsel was allowed to question Dr. Davis generally on the suggestibility of children and was able to use Dr. Davis' testimony to effectively argue in her closing statement that J.M.'s testimony was improperly manufactured as she was influenced by her mother and other government officials.[11]

Thus, although Dr. Davis' direct examination did not explicitly discuss the concept of suggestibility, her testimony regarding accessing children's fragmented memories, may have generally raised the issue of suggestibility. The extent of examination by Mindombe on this issue, however, is committed to the sound discretion of the trial court. In light of the fact that the trial court allowed defense counsel the opportunity to effectively establish her main point, that suggestibility can influence the accuracy of children's memories,

10. Dr. Davis testified that children remember "pretty well compared to adults. . . . But they have good memory for the main things that happened. The problem is that they don't have techniques to access their memory." She went on to state: "So in order to help children remember, what we have done is constructed questions that have more memory cues in them."

11. Specifically, defense counsel commented that: "Dr. Davis told you that children are influenced by the things that they see and hear around them, by the things they see and hear from adults."

on this record we cannot say that the trial court abused its discretion by disallowing some of the more specific questions asked of Dr. Davis by Mindombe on cross-examination.

### C. Mindombe's attempts to impeach J.M.'s testimony by Omission

Mindombe also argues that the trial court abused its discretion by preventing him to impeach J.M's testimony by omission. On three occasions, during the second trial, defense counsel attempted to impeach by omission J.M.'s testimony with her prior testimony in the first trial. In each instance, the trial court sustained objections to the attempted impeachment on the ground that the question posed in the first trial was so different than the question presented in the second trial, that it would not have been natural for J.M. to have mentioned at the first trial the additional details brought out at the second trial. As aforestated, the scope and extent of cross-examination of a witness is committed to the sound discretion of the court. *Singletary*, 383 A.2d at 1073. Specifically, with respect to impeachment, this court has used a three-part test to determine whether an omission is admissible for impeachment purposes. *See Hill v. United States*, 404 A.2d 525, 531 (D.C.1979).

(1) the prior statement should purport to address the facts surrounding the omission of the alleged offense; (2) the proponent must apprise the trial court of the omitted facts to be relied upon as showing inconsistency; and (3) the trial court must consider whether such facts are sufficiently material that the failure to mention them amounts to inconsistency.

*Id.* In these cases, the trial court is asked to simply decide whether "the prior statement fail[ed] to mention a material circumstance presently testified to, which it would have been natural to mention in the prior statement...." *Sampson v. United States*, 407 A.2d 574, 576 (D.C.1976).

Two of the circumstances involved J.M.'s response at the first trial to a question about whether Mindombe had done anything to her at the Rock Creek Ford Road apartment that made her sad or hurt her. Mindombe claims that her testimony in the second trial that she was abused sexually in the bathtub of the Rock Creek Ford Road apartment was a material omission because she failed to mention the bathtub incident in the first trial in response to the aforementioned question. Mindombe argues that J.M.'s failure to mention the bathtub incident in the first trial amounted to an inconsistency that he should be able to use to attack J.M.'s credibility in the second trial. Similarly Mindombe claims that J.M.'s testimony in the second trial that her father gave her rides on his back into his bedroom before abusing her was a material fact that amounted to an inconsistency because she failed to mention it in response to the question about whether Mindombe did something to [J.M.] at the Rock Creek Ford apartment that made her sad or hurt her.

With respect to the latter claim, the trial court ruled and we agree that J.M.'s testimony about being given a ride on her father's back would not have been an appropriate response to the several questions posed by Mindombe in the first trial. Because there was no indication in the second trial that J.M. was either hurt or saddened by her father giving her a piggy back ride to the bedroom, the trial court did not err in finding that J.M.'s prior testimony did not omit a material fact that would have been natural for J.M. to have mentioned.

As for Mindombe's contention that J.M.'s failure to mention the bathtub incident in the first trial amounted to an in-

consistency he should have been allowed to exploit in the second trial, the trial court reached a similar conclusion. Because the question posed in the first trial concerned Mindombe's abuse of J.M. when she would visit him after the family split up, and J.M.'s testimony about the bathtub incident was that it occurred while the family was still living together at the Rock Creek Ford apartment, the trial court's finding that the omission failed to meet the sufficiency test was not an abuse of discretion.

■ Finally defense counsel attempted to impeach J.M.'s testimony in the second trial that a "spirit" moved her to tell her mother about the abuse. Defense counsel argued that her omission of that testimony at the first trial in response to a question about why she did not tell her mother or anyone else about the abuse amounted to an inconsistent prior statement. At the second trial, however, J.M. was asked what caused her to choose [a] particular day to tell her mother; whereas at the first trial she was simply asked why she did not tell her mother. Clearly, the question posed to J.M. at the first trial did not naturally call for her statement in the prior trial that the "spirit" moved her on that particular morning to tell her mother. *See Hill,* 404 A.2d at 531; *Sampson,* 407 A.2d at 576–77. Therefore, the trial court did not abuse its discretion in prohibiting the defense from impeaching J.M.'s testimony by omission with statements that would not have been a natural response to the questions asked of her in the first trial.

*D. Sufficiency of the Evidence*

■ Finally, Mindombe also asserts on appeal that there was insufficient evidence to support his convictions. In reviewing sufficiency claims, we view the evidence in the light most favorable to the government, *see Kelly v. United States,* 639 A.2d 86, 89–90, and reversal is required only

where there is no evidence to support an inference of guilt beyond a reasonable doubt. *See Patton v. United States,* 633 A.2d 800, 820 (D.C.1993). In this case, J.M.'s testimony is sufficient to support Mindombe's convictions, and her testimony did not require independent corroboration. *See Barrera v. United States,* 599 A.2d 1119, 1124–25 (D.C.1991).

Accordingly, the judgment of the trial court is

*Affirmed.*