John JONES, Appellant,

v.

UNITED STATES, Appellee.

No. 07–CF–783.

District of Columbia Court of Appeals.

Argued April 29, 2008.
Decided March 18, 2010.

Oliver Dean Sanderford, Public Defender Service, with whom James Klein and Samia Fam, Public Defender Service, were on the briefs, for appellant.

Elizabeth H. Danello, Assistant United States Attorney, with whom Jeffrey A. Taylor, United States Attorney at the time, Roy W. McLeese III, and Cynthia G. Wright, Assistant United States Attorneys, were on the brief, for appellee.

Before GLICKMAN and BLACKBURNE–RIGSBY, Associate Judges, and ROSS, Associate Judge, Superior Court of the District of Columbia.*

* Sitting by designation pursuant to D.C.Code § 11–707(a) (2001).

GLICKMAN, Associate Judge:

Appellant Jones stands convicted of misdemeanor sexual abuse and simple assault. The victims of these offenses were two students at the high school where Jones was a counselor and teacher. Jones claims the trial judge committed reversible error in admitting expert testimony explaining the methods of child sex offenders and the reactions of their immature victims. We disagree and affirm Jones's convictions.

## I.

In August of 2003, the grand jury returned a 25–count indictment against appellant, charging him with sex offenses against L.B., K.H., and R.D., three female students at Ballou Senior High School, where appellant had worked as an attendance counselor and stage-crew coordinator. At appellant's first trial, held in early 2004, the court dismissed two of the counts on the government's motion and the jury found appellant not guilty of eight other counts. The jury could not reach a verdict on the remaining fifteen counts. Appellant was retried on those counts in May and June of 2004.

Four of the surviving counts charged appellant with felony offenses against L.B. when she was fifteen years old.[1] Seven more counts charged him with misdemeanor sexual abuse of L.B. after she had turned sixteen, the age of consent. L.B. testified at trial that appellant befriended her after she met him in the attendance office at Ballou in her sophomore year. A troubled adolescent with a traumatic family background, L.B. found she could con-

---

1. These counts charged appellant with first-degree sexual abuse, first-degree child sexual abuse, second-degree child sexual abuse, and enticing a child.

fide in appellant, whom she described as "nice." Appellant listened to L.B. and assured her he would "be there" if she needed him. He bought her new shoes and called himself her "godfather." He told L.B. she was pretty. After a while, L.B. claimed, he began telling her he wanted to have sex with her.

According to L.B., their first sexual encounter occurred in the spring of her sophomore year, when she was fifteen years old. Appellant asked her to come with him to the school auditorium to help him set up some tables on the stage. Once they were there, L.B. claimed, appellant closed the curtain, turned off the lights, grabbed her, and forced her to submit to sexual intercourse against her will. A few months later, after L.B. turned sixteen, appellant began having sex with her on a regular, almost weekly basis. They met for that purpose either at Ballou or in appellant's apartment. L.B. did not resist appellant's advances or report him, she testified, "because at that time I didn't think I had a choice." She feared appellant would access the school computer system to change her grades (an ability he told her he possessed) and she "would fail." In February 2003, however, L.B. contracted genital warts, a sexually transmitted condition. Only then, to a gynecologist who examined her, did L.B. disclose appellant's abuse. At that point the police were notified.

The remaining counts involve appellant's alleged offenses against R.D. (simple assault and enticing a child) and K.H. (assault with intent to commit first-degree sexual abuse and simple assault). R.D. testified that appellant frequently made sexually suggestive comments to her when she was in his stage-crew class in her sophomore year. One morning, she testified, appellant approached her before class, made a sexual remark, and kissed her without warning on her lips. (This was the basis for the assault charge.) On another occasion, R.D. claimed, she was in the attendance office and appellant locked the door, turned off the lights, and proposed taking her to a hotel "and other stuff." (This was the basis for the enticing count.) The charges involving K.H. related to an incident in her junior year in which appellant allegedly put his hand under her skirt and kissed her on the neck while she was trying to use the telephone in the school security office. K.H. reported the assault later that day. She testified that she was reluctant to do so because appellant had told her he could change students' grades and she was afraid he would change hers.

The government called two significant witnesses at appellant's second trial whom it had not presented at his first trial. One of those witnesses was S.B., who testified that appellant raped her in 1992 when she was living in foster care with the grandmother of his son.[2] This testimony was admitted, with a limiting instruction, to show that appellant had a particular preference for sexual relations with teenage girls.[3] The other new witness was Kenneth Lanning, a former special agent in the Behavioral Science Unit of the Federal Bureau of Investigation. Qualified by the court as an expert on the sexual victimization of children, Lanning testified about the methods employed by preferential child molesters and the behavior of their victims. Lanning professed no knowledge about the facts of appellant's case and

---

2. S.B. reported the incident, and appellant was prosecuted. His trial ended in a mistrial. After consulting with S.B., the government elected not to retry the case.

3. See (Tyrone W.) Johnson v. United States, 610 A.2d 729 (D.C.1992). Appellant does not claim error in the admission of S.B.'s testimony.

expressed no opinion on appellant's guilt or the credibility of his accusers. We shall describe Lanning's testimony in greater detail below.

Appellant's defense was that the three teenaged complainants had fabricated their allegations against him. The defense focused in large part on their motives to lie about him, their delay in reporting his abuse, and the inconsistencies in their accounts. Appellant also presented evidence that he and L.B. had enjoyed a close, friendly relationship. Among other things, appellant's wife testified that L.B. regularly visited them at their home. On cross-examination L.B. acknowledged that she continued to call appellant after he left Ballou, and that she sent him a school picture on which she had written "to my godfather and godmother" and "love you." L.B. also admitted that her grades were poor and that appellant had never threatened explicitly to change them.

At the close of the government's case, the judge granted appellant's motion for judgment of acquittal on the charge of second-degree child sexual abuse (involving L.B.). The jury acquitted appellant of the remaining felony charges and of the charge of simple assault relating to K.H. It convicted appellant on the seven counts of misdemeanor sexual abuse of L.B. and on the count of simple assault against R.D. Subsequently, with the government's agreement, the judge vacated appellant's convictions on three of the misdemeanor sexual abuse counts on merger grounds.[4] Thus, at the end of the day, appellant stood convicted of four counts of misde-

meanor sexual abuse and one count of simple assault.

## II.

The government notified appellant two months before the start of his second trial of its intention to call Kenneth Lanning as an expert witness on the sexual victimization of children. The government proffered Lanning as an "education" witness who would describe in general terms how "preferential" child molesters "groom" and manipulate their immature victims, how those victims become compliant and cooperate with their abusers, and how they delay reporting their abuse and provide inconsistent accounts because they feel shame, embarrassment and guilt on account of their acquiescence. In a motion filed in open court on the day of trial, and in extended argument on that motion, appellant objected to Lanning's testimony on several grounds. Appellant argued that (1) Lanning's proffered testimony was not beyond the ken of the average juror; (2) Lanning was not qualified to testify about victim behavior; (3) his method of classifying sex offenders was not generally accepted; and (4) his testimony about offenders would be substantially more prejudicial than probative. Appellant also expressed concern that the jury might take Lanning's testimony about compliant victims to mean that consent would not be a defense even if the alleged victim was over the age of sixteen. The judge overruled appellant's objections and permitted the government to call Lanning.[5] To avoid unfair prejudice to appellant, the judge instructed the government to limit Lanning's testimony

---

**4.** *See Cullen v. United States,* 886 A.2d 870 (D.C.2005).

**5.** Because the judge had the advantage of reading transcripts of Lanning's testimony in other cases, she found it unnecessary to hold a pretrial evidentiary hearing on appellant's

motion. However, the judge permitted appellant to conduct a voir dire examination of Lanning during his testimony at trial before finally accepting his qualifications as an expert in the sexual victimization of children.

about characteristic traits of child molesters to the ones appellant allegedly had displayed. Additionally, the judge offered to instruct the jury specially on the issue of consent after Lanning testified.

In his trial testimony, Lanning explained that his qualifications to testify about the sexual victimization of children rested primarily on his two decades of experience in the FBI's Behavioral Science Unit (BSU). According to Lanning, the work of the BSU involved applying the "knowledge of the behavioral sciences ... in a practical way to dealing with fact finding and investigation and prosecution of cases." Lanning's main focus at the BSU was on sexual offenses against children: he studied the behaviors of both offenders and victims in order to apply what he learned to the investigation and prosecution of child sex offense cases. Although Lanning was not trained as a psychologist or psychiatrist, he had earned a master's degree in administration of justice and had completed the course work for a master's degree in criminal justice. In the latter program, he testified, he took "a lot" of behavioral science classes, including classes on deviant sexual behavior and sex crimes.

Lanning's research in his years at the BSU chiefly consisted of studying thousands of case files that had been compiled for law enforcement purposes. He estimated that 400 to 500 of the files he had studied involved teenaged victims, approximately half of them adolescent girls who had been victimized by adult males. Although Lanning had not interviewed these victims personally, he worked directly with the investigators who had done so. Lanning testified that he had published the fruits of his research on child sexual

victimization in "numerous articles and chapters," such as a "widely disseminated" monograph entitled "Child Molesters, a Behavioral Analysis for Law Enforcement," and a book chapter entitled "Sexual Exploitation of Children." His writings had appeared in publications of the FBI and the National Center for Exploited and Missing Children, among other organizations. All his published writings, Lanning stated, had passed through peer review of some kind.[6]

Lanning also had consulted on thousands of child sex cases and participated in hundreds of training courses all over the world on the sexual victimization of children.[7] In the latter connection, Lanning said, he had worked with professionals in the areas of social work, mental health and medicine, as well as with law enforcement personnel and victim advocates. In addition, Lanning had testified as an expert witness on child sex abuse in approximately fifty court proceedings throughout the United States and on seven occasions before Congress.

Lanning's opinion testimony in appellant's trial focused on "preferential" child molesters and their "compliant victims." As to the former, Lanning explained that while child molesters constitute "a diverse population of individuals" that can be classified in different ways, "over the years" he had developed a "typology" to use for his own purposes and which he had trained others to employ. His typology looked at child molesters "along a continuum from situational to preferential." Preferential offenders are those who have a clear and persistent sexual preference, "most often

**6.** It appears, however, that Lanning did not mean the kind of rigorous peer review associated with publication in refereed scientific journals.

**7.** After he retired from the FBI, Lanning continued working as a private consultant on cases involving sex crimes against children.

for children."[8] The most successful preferential abusers are typically "nice guys," often authority figures such as teachers, who employ age-old techniques of seduction, or what Lanning called "grooming."[9] The key feature of this grooming process is that the abuser identifies and tries to fill a child's needs, for example by listening sympathetically to the child, complementing her on her looks, giving her hugs, and buying her things she needs.

After having formed a relationship of trust and dependence, the abuser undertakes to manipulate the child's feelings and overcome her sexual inhibitions. Contrary to popular belief, Lanning explained, child molesters usually do not force themselves on their victims; in fact, only about 10 to 15 per cent of child sex offenses involve "extreme violence." The preferential abuser's goal is to bond with the child in order to control her psychologically. Children from dysfunctional homes, especially teenagers, are most susceptible to being groomed in this way, Lanning said. He added, however, that preferential child molesters "may" employ such unsavory tactics as exposing children to pornography, supplying them with drugs and alcohol, blackmailing them, and coercing their silence by threats of suicide. As one example of the use of blackmail or threats he had observed in cases involving child molesters who were teachers, Lanning mentioned "not giving [students] a proper grade, giving them the wrong grade."

The grooming process results in what Lanning called "compliant victims"—children who cooperate in their victimization. Their non-resistance may seem to indicate consent, Lanning stated; indeed, the children may return to their abusers and even enjoy the sexual activity. However, Lanning opined, compliant victims "suffer a lifetime of shame, embarrassment and guilt because their victimization does not fit society's understanding" that children do not willingly acquiesce in abuse. According to Lanning, those feelings help explain why victimized children fail to disclose or delay disclosure of their abuse, and why their disclosures often contain "incomplete," "inaccurate," "distorted," or "contradictory" information. (On cross-examination, Lanning conceded that some children may give contradictory accounts of abuse simply because they are being untruthful.)

Although appellant did not raise consent as his defense at trial, he repeated his concern that the jury could misunderstand Lanning's testimony about compliant victims to mean that consent by an individual over sixteen years of age would not be a defense to a sex abuse charge. To prevent that misunderstanding, the judge instructed the jury immediately after Lanning was excused on the defense of consent in the District of Columbia. The judge cautioned the jury that Lanning did not use the word "consent" in its legal meaning and that his testimony did not furnish "any legal guidance" on the issue of appellant's guilt or innocence. Appellant does not challenge the instruction's adequacy.

## III.

■ The admissibility of expert testimony in the Superior Court of the District of Columbia is governed by the three-part test we adopted in *Dyas v. United States:*

---

8. By contrast, situational offenders do not have such a clear preference but take sexual advantage of children in an "opportunistic" way.

9. In other words, Lanning explained, "[t]hese individuals seduce children essentially the same way that men and women have been seducing each other since the dawn of mankind."

(1) the subject matter must be so distinctively related to some science, profession, business or occupation as to be beyond the ken of the average layman; (2) the witness must have sufficient skill, knowledge, or experience in that field or calling as to make it appear that his opinion or inference will probably aid the trier in his search for truth; and (3) expert testimony is inadmissible if the state of the pertinent art or scientific knowledge does not permit a reasonable opinion to be asserted even by an expert.[10]

The third criterion incorporates the so-called *Frye* test, under which scientific testimony is admissible only if the theory or methodology on which it is based has gained general acceptance in the relevant scientific community.[11] Expert testimony admissible under the criteria of *Dyas* and *Frye* is still subject to exclusion if the danger of unfair prejudice substantially outweighs its probative value.[12]

■ "The trial judge has wide latitude in the admission or exclusion of expert testimony, and his [or her] decision with respect thereto should be sustained unless it is manifestly erroneous."[13] Thus, we have said, "our scope of review on this issue is narrow."[14] Ordinarily, where the claim of error was preserved by timely and proper assertion in the trial court, we review the judge's ruling for abuse of discretion. However, with respect to the *Frye* issue of whether a new scientific theory or methodology has gained general acceptance, our review is de novo.[15] Claims raised for the first time on appeal are subject to review only for plain error.[16]

Appellant challenges the admission of Lanning's testimony on several grounds, not all of which he raised in the trial court. Invoking each of the three *Dyas* criteria, appellant contends that Lanning's testimony was not beyond the ken of the average juror; that Lanning was unqualified to offer an expert opinion regarding the behavior of child sex abuse victims and the manipulative techniques used to induce that behavior; and that the methodology underpinning Lanning's opinions about victim psychology was not generally accepted by the scientific community. Appellant also argues that Lanning's testimony was unduly prejudicial. We address each of these contentions in turn.

10. 376 A.2d 827, 832 (D.C.1977) (internal emphasis, quotation marks and citation omitted).

11. *See Frye v. United States*, 54 App. D.C. 46, 47, 293 F. 1013, 1014 (1923) ("[W]hile courts will go a long way in admitting expert testimony deduced from a well-recognized scientific principle or discovery, the thing from which the deduction is made must be sufficiently established to have gained general acceptance in the particular field in which it belongs."); *United States v. Porter*, 618 A.2d 629, 633 (D.C.1992) ("[U]nder *Frye*, the proponent of a new technology must demonstrate by a preponderance of the evidence that this technology has been generally accepted in the relevant scientific community."); *Ibn–Tamas v. United States*, 407 A.2d 626, 638 (D.C.1979) ("[S]atisfaction of the third *Dyas* criterion begins—and ends—with a determination of whether there is general acceptance of a particular scientific methodology, not an acceptance, beyond that, of particular study results based on that methodology.").

12. *See Nixon v. United States*, 728 A.2d 582, 594 (D.C.1999).

13. *In re Melton*, 597 A.2d 892, 897 (D.C.1991) (en banc) (quoting *Coates v. United States*, 558 A.2d 1148, 1152 (D.C.1989)).

14. *Ibn–Tamas*, 407 A.2d at 632 (internal quotation marks and citations omitted).

15. *See Jones v. United States*, 548 A.2d 35, 40 (D.C.1988); *see also Roberts v. United States*, 916 A.2d 922, 929 (D.C.2007).

16. *See, e.g., Nixon*, 728 A.2d at 587.

## A. The Need for Expert Testimony

■ Appellant claims the trial judge erred in concluding that Lanning's testimony about the "grooming" techniques employed by child molesters satisfied the first *Dyas* criterion, i.e., that it was "beyond the ken" of the average juror. Citing the attention paid by the media in recent years to the subject of acquaintance abuse, appellant argues "there is no reason to believe that the average juror is unaware that child molesters often gain access to their victims through seduction rather than forcible abduction." [17] Appellant preserved this claim in the trial court.

■ It is common, however, for experts to testify in criminal cases about the *modus operandi* of certain types of criminal offenders.[18] Courts generally permit such expert testimony because "jurors cannot be presumed to have knowledge of these matters," [19] and it therefore may help the jury understand and evaluate the evidence. *Modus operandi* testimony may be helpful, and hence admissible under *Dyas's* first criterion, even though it may be familiar to "the average reader of the daily press." [20] Under these principles, the D.C. Circuit, among other courts, has upheld the admission of Lanning's testimony on the grooming techniques of child molesters precisely because "the average layperson lacks knowledge regarding the manner in which preferential sex offenders operate." [21] In the words of the Seventh Circuit, Lanning's *modus operandi* testimony "was critical in dispelling from the jurors' minds the widely held stereotype of a child molester as 'a dirty old man in a wrinkled raincoat' who snatches children off the street as they wait for the school bus." [22] While the continuing vitality of such stereotypes may be debatable, we cannot conclude that the trial judge in this case abused her discretion in ruling that Lanning's "grooming" testimony "was beyond the ken of a lay trier of fact and would be helpful to the jurors in their consideration of the evidence." [23] The testimony helped to explain not only how a child molester could accomplish his crimes without violence, but also why a child victim would acquiesce and be reluctant to turn against her abuser.

## B. Lanning's Qualifications

■ To be qualified as an expert, a witness "must have sufficient skill, knowledge, or experience" in the relevant field so that his testimony "will probably aid the

---

17. Brief of Appellant at 35. Appellant does not raise a similar challenge to Lanning's testimony about the behavior of child victims. This Court previously has recognized that the behavioral characteristics and psychological dynamics of child molestation victims are beyond the ken of the average juror. *See Mindombe v. United States,* 795 A.2d 39, 42 (D.C. 2002); *Oliver v. United States,* 711 A.2d 70, 73 (D.C.1998).

18. *See, e.g., Hinnant v. United States,* 520 A.2d 292, 293 (D.C.1987) ("Because the use, sale, and packaging of heroin on the streets are not matters within the ken of the average lay person, expert testimony on the *modus operandi* of drug traffickers may be admitted if relevant.").

19. *United States v. Long,* 356 U.S.App. D.C. 117, 129, 328 F.3d 655, 667 (2003).

20. *Irick v. United States,* 565 A.2d 26, 31 (D.C.1989) (upholding admission of expert testimony regarding the association between drugs and firearms); *see also Nixon,* 728 A.2d at 591.

21. *Long,* 356 U.S.App. D.C. at 129, 328 F.3d at 667.

22. *United States v. Romero,* 189 F.3d 576, 584 (7th Cir.1999).

23. *Nixon,* 728 A.2d at 591.

trier in his search for truth."[24] Appellant claims that Lanning's testimony about compliant child victims was "an exercise in child psychology" for which Lanning lacked the requisite qualifications because he was not trained as a psychologist or psychiatrist and had not interviewed victims of child sex abuse.[25] The trial judge, concluding that Lanning was qualified on the basis of his extensive experience in the field of child sexual victimization, ruled that appellant's objections went to the weight to be given Lanning's testimony but not its admissibility.

We are not persuaded that the judge's acceptance of Lanning's qualifications was manifestly erroneous. Expertise may be predicated on experience rather than academic training. "Scholarship is not a prerequisite for eligibility to testify as an expert witness; the relevant knowledge may be derived from professional experience, including, in particular, experience as a police officer."[26] To be sure, "experience" is a slippery concept. There has to be a fit between the witness's experiential qualifications and the testimony to be offered; "[a] witness may be qualified as an expert on certain matters and not others."[27] Accordingly, where a proffered expert's qualifications are based primarily on experience, the witness should be able to "explain how that experience leads to the conclusion reached, why that experience is a sufficient basis for the opinion, and how that experience is reliably applied to the facts," so that the judge may evaluate whether the witness truly is qualified to render an opinion on the matter in question.[28]

In this case, while Lanning apparently lacked formal academic training in psychology,[29] he spent over twenty years in the Behavioral Science Unit studying the sexual victimization of children. He had shared his conclusions with, and undoubtedly had received feedback from, other professionals working in the same or related areas, including mental health specialists. There is no question Lanning was qualified to describe the behavior patterns he had observed in hundreds of cases, and his "psychological" testimony was grounded in those observations and correspondingly modest in scope. In advancing the general reasons child victims cooperated in

24. *Dyas v. United States*, 376 A.2d 827, 832 (D.C.1977) (internal emphasis, quotation marks and citation omitted). It should go without saying, but perhaps it does bear repeating, that qualifications are a necessary but not a sufficient condition for the admission of proffered expert testimony. The other requirements of *Dyas* must be satisfied. In particular, as discussed in the next section of this opinion, under *Frye* even a qualified scientific expert's opinion testimony should be excluded if it is not based on a methodology that has gained general acceptance in the pertinent field.

25. Brief for Appellant at 23.

26. *Karamychev v. District of Columbia*, 772 A.2d 806, 812 (D.C.2001).

27. *United States v. Roldan–Zapata*, 916 F.2d 795, 805 (2d Cir.1990). Relatedly, that an expert has impressive credentials and has been permitted to testify in other cases does not answer the question of the expert's qualifications to provide the particular testimony being offered in the case at hand. *See, e.g., United States v. Nacchio*, 555 F.3d 1234, 1258 (10th Cir.2009).

28. Fed.R.Evid. 702 advisory committee's note (2000).

29. Appellant may be underestimating Lanning's credentials. Unfortunately, Lanning was not asked about his familiarity with the psychological literature on child sexual abuse, the specialized training he had received as a member of the Behavioral Science Unit, or the mental health experts (if any) with whom he might have consulted or studied. However, in this as in other respects, we take the record as we find it.

their abuse and were reluctant to report it, Lanning did not purport to offer a psychiatric diagnosis or profile or a sophisticated description of a child victim's mental processes. The judge was presented with no evidence that Lanning's methods or his opinions about victim psychology were controversial or suspect. And as the judge noted, Lanning had been qualified to testify as an expert on child molesters and their victims in a large number of other jurisdictions.[30] Given Lanning's experience, his extensive study and the limited nature of his "psychological" testimony, the judge did not abuse her discretion in finding that he had acquired sufficient knowledge to be qualified to address the subjects he did.

## C. Lanning's Methodology

■■■■ Appellant argues, and the government concedes, that Lanning's testimony concerning the psychological reasons for children's reactions to sexual abuse was scientific in nature and hence was subject to *Frye*.[31] Under *Frye*, the methodology underpinning scientific testimony must enjoy general acceptance among practitioners in the relevant field of scientific inquiry, and our review of that question is *de novo*. Appellant cogently argues, and the government all but concedes, that the methodology Lanning used to reach his conclusions about victim psychology was not shown to pass muster under the "general acceptance" test. An expert's "experience" is not a substitute for the scientific method, which requires techniques more rigorous than just the accumulation of observations and intuitively plausible deductions. At a minimum, appellant asserts, the scientific study of behavior requires critical inquiry guided by theory and hypothesis, systematic and controlled observation and collection of data, careful documentation, and structured analysis.[32] There is no evidence Lanning employed scientific methods in deriving his opinions about victim psychology from the law enforcement case files that happened to come to his attention. Although Lanning unfortunately was not pressed to clarify exactly how he arrived at those opinions, he conceded that his methods were "informal" and undocumented.

■■■ But as the government argues, appellant did not object to Lanning's testimony about victim psychology on this ground in the trial court. While appellant did raise a *Frye* objection, he limited it to Lanning's testimony about offenders. Specifically, he argued only that Lanning's

---

**30.** *See, e.g., United States v. Hayward,* 359 F.3d 631, 635–37 (3d Cir.2004); *United States v. Long,* 356 U.S.App. D.C. 117, 127–130, 328 F.3d 655, 665–68 (2003); *United States v. Romero,* 189 F.3d 576, 582–87 (7th Cir.1999); *State v. Sorabella,* 277 Conn. 155, 891 A.2d 897, 931–35 (2006). As the judge recognized, these were jurisdictions in which admissibility of expert testimony is governed by Federal Rule of Evidence 702 (or a comparable state rule) as construed by the Supreme Court in *Daubert v. Merrell Dow Pharmaceuticals, Inc.,* 509 U.S. 579, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993), rather than by the standards set forth in *Dyas.* For present purposes, however, the significant difference is that *Daubert* deemphasized the general acceptance test of *Frye* and placed the responsibility on the judge to evaluate the scientific validity of the basis for expert testimony. It remains true under *Daubert* and Rule 702 that experts may be qualified to testify by virtue of their experience as opposed to their training, and that the decision is committed to the trial judge's broad discretion.

**31.** *See, e.g., Ibn–Tamas v. United States,* 407 A.2d 626, 637–39 (D.C.1979) (applying *Frye* to psychological testimony explaining the behavior of "battered women").

**32.** *See generally* 1 DAVID L. FAIGMAN ET AL., MODERN SCIENTIFIC EVIDENCE: THE LAW AND SCIENCE OF EXPERT TESTIMONY §§ 5:1–5:5 (2009–2010 ed.).

offender typology was not generally accepted (an argument not pursued on appeal).[33] Although appellant disputed Lanning's *qualifications* to testify about victim psychology, he did not contend that the *methodology* underlying Lanning's testimony on that subject lacked general acceptance.[34] Consequently, whether Lanning's research into victim psychology met the requirements of scientific methodology was never explored in the trial court and no record on the issue adequate for appellate review was made. "If, under these circumstances, we may consider the contention at all, our review must be for plain error." [35]

"Under the established four-part test for plain error, an appellant must demonstrate not merely that there was an error, but also that the error was 'clear' or 'obvious'—'so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." [36] If there was error in the admission of any portion of Lanning's testimony, it was not "clear" or "obvious" error. As we have said, the trial judge was presented with no evidence that Lanning's methodology was scientifically unorthodox or controversial. We would not expect the judge to have recognized on her own that Lanning might not have employed the scientific method of inquiry: "under *Frye*, judges seemingly do not need to have any facility with scientific methods to make the admissibility decision." [37] Accordingly, we conclude that appellant has

33. We are inclined to agree with the government that Lanning's mere description of offenders and their behavior (*modus operandi*) was not scientific testimony subject to *Frye's* requirements. "[W]here an expert testifies to 'general behavioral characteristics' based upon the expert's 'professional experience' and does not rely on 'novel scientific technique' or employ 'any special techniques or models,' *Frye* ... is not implicated." *United States v. Bighead*, 128 F.3d 1329, 1330 (9th Cir.1997) (upholding admission of testimony about delayed disclosure and other typical characteristics of children who reported having been abused sexually).

34. Appellant argues that he preserved his current *Frye* challenge because, in critiquing Lanning's qualifications (not his methodology), he made the assertion in passing that "Lanning's analysis cannot be construed as scientific in any regard." In context, however, this assertion was directed at Lanning's typology of offenders. In our view, it was not sufficient to alert the trial judge that appellant claimed the methodology underlying Lanning's testimony about victim psychology was not generally accepted in the relevant scientific community. Appellant argues that "once a claim is properly presented to the trial court, a party can make any argument in the appellate court in support of that claim; parties are not limited to the precise arguments made below." *Randolph v. United States*, 882

A.2d 210, 217–18 (D.C.2005) (quoting *Yee v. Escondido*, 503 U.S. 519, 534, 112 S.Ct. 1522, 118 L.Ed.2d 153 (1992) (internal quotation marks, capitalization, ellipses and brackets omitted)). But it is one thing to make new legal arguments on appeal to support a claim made below. It is another thing to advance an entirely new factual claim. In our estimation, appellant's current *Frye* challenge falls in the latter category.

35. *Nixon v. United States*, 728 A.2d 582, 589 (D.C.1999).

36. *Comford v. United States*, 947 A.2d 1181, 1189 (D.C.2008) (footnote omitted). In addition, the appellant must demonstrate that the error affected his substantial rights and the fairness, integrity, or public reputation of the proceedings. *Id.* at 1189–90. Given our conclusion that any error was not clear or obvious, we need not consider whether these additional requirements of the test for plain error are met.

37. FAIGMAN ET AL., *supra* note 32, § 1:7 at 21. The trial judge's role has undergone a marked change in this regard under *Daubert*. "Judges and lawyers, long insulated from the scientific revolution, are now obligated [by Federal Rule of Evidence 702] to become familiar with the methods and culture of science." *Id.*

not shown plain error in the failure to exclude Lanning's testimony under *Frye*.[38]

### D. Danger of Unfair Prejudice

Evidence that is otherwise relevant and admissible may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice.[39] Appellant's final claim is that parts of Lanning's testimony about child molesters were "irrelevant and inflammatory."[40] Appellant specifically complains of Lanning's references to such repugnant tactics as blackmail, threats and offering children pornography, drugs and alcohol. Appellant argues there was no evidence he had engaged in any such behavior, and that Lanning's recitation of these "lurid and irrelevant details"[41] served only to link him unfairly to reprehensible conduct with which he was not charged.

Appellant overstates his case. Lanning's testimony was not irrelevant merely because some common offender conduct he had observed had not been ascribed to appellant. In point of fact, there was evidence from which the jury could infer that appellant did blackmail L.B., via an implicit threat to alter her grades. And even if some of Lanning's comments contravened the judge's prior admonition to confine his description of offender behavior to conduct of which appellant was accused, we are not persuaded that appellant was prejudiced. Lanning admitted knowing nothing about the facts of appellant's case and never opined that appellant fit any sort of profile of a child molester. Indeed, Lanning did not purport to provide such a profile at all; he made it clear that not all child molesters behaved in the same way or employed the unsavory tactics he described. We see no reason to believe the jury attributed any reprehensible conduct to appellant for which there was no evidence. If anything, Lanning's testimony about such conduct provided fodder for the defense to *distinguish* appellant from the offenders Lanning had studied.

## IV. Conclusion

We conclude that the trial judge did not commit reversible error by admitting Lanning's testimony. Appellant's convictions are hereby affirmed.

---

**38.** We caution that we do not retreat in any way from this Court's insistence on faithful adherence to the requirements of *Dyas* and *Frye*. Trial counsel and judges have an obligation to be familiar with those requirements. As we have said, "because expert or scientific testimony possesses an aura of special reliability and trustworthiness, the proffer of such testimony must be carefully scrutinized." *Ibn–Tamas v. United States*, 407 A.2d 626, 632 (D.C.1979) (internal quotation marks and citation omitted). "[The trial] court must take no shortcuts; it must exercise its discretion with reference to *all* the necessary criteria." *Id.* at 635 (citing *(James W.) Johnson v. United States*, 398 A.2d 354, 363–67 (D.C.1979)). Where *Frye* applies, the proponent of the evidence must be able to demonstrate by a preponderance of the evidence that the specific opinion testimony to be offered—however plausible or commonsensical it may seem—is based on theory, technique, method or technology that actually does enjoy general acceptance among scientists (not other courts) in the relevant field of inquiry. *See, e.g., Roberts v. United States*, 916 A.2d 922, 929 (D.C. 2007); *United States v. Porter*, 618 A.2d 629, 633–34 (D.C.1992). By the same token, the party opposing admission of expert testimony should be prepared to challenge it with specificity on every applicable ground.

**39.** *(William A.) Johnson v. United States*, 683 A.2d 1087, 1099 (D.C.1996) (en banc).

**40.** Brief for Appellant at 34.

**41.** *Id.*