Bryant K. MATTHEWS, Appellant,

v.

UNITED STATES, Appellee.

No. 08–CF–1467.

District of Columbia Court of Appeals.

Argued Oct. 6, 2010.
Decided Feb. 24, 2011.

Veronice A. Holt, Washington, DC, for appellant.

Jonathan P. Hooks, Assistant United States Attorney, with whom Ronald C. Machen Jr., United States Attorney, and Roy W. McLeese III, Chrisellen R. Kolb, and John J. Soroka, Assistant United States Attorneys, were on the brief, for appellee.

Before RUIZ, KRAMER, and THOMPSON, Associate Judges.

KRAMER, Associate Judge:

Appellant Bryant Matthews was found guilty of conspiracy to commit robbery while armed, two counts of felony murder for the death of DuShawn Swann and two counts of attempted robbery while armed for the attempted robbery of Swann and his companion Jason Ingram. Matthews appeals these convictions alleging that the trial court erroneously admitted a hearsay statement of his co-defendant, that the prosecution was permitted to argue facts not in evidence in its closing, that there was insufficient evidence to convict him of the attempted armed robbery of Swann, and that the trial court improperly sentenced him because some of his convictions merge.[1] For the reasons stated below, we

---

1. Appellant raises a few other claims but, after having given them due consideration, we find them meritless.

affirm on every issue but remand for re-sentencing.

## I. Factual Background

Jason Ingram, a tattoo artist, was invited to come to 2830 Robinson Place, Southeast, to the apartment of Mary Chase, for a tattoo party during which Ingram would provide discount tattoos. Elissa Toyer resided at the apartment. On March 5, 2008, Ingram drove to Robinson Place, accompanied by his friend DuShawn Swann, who assisted Ingram at the party though he was not Ingram's employee and did not receive any compensation for his assistance. Ingram brought his own tattoo equipment and a lamp which he transported in three bags.

Throughout the evening, Ingram received cash for his tattoos, exchanging money openly at the party. He estimated that he earned $1000 during the evening. Appellant Matthews and his co-defendants, Darnell Dubose and Demetrius Stevenson, were present at the party.[2] At one point during the evening, Matthews requested that Ingram give him a tattoo of his birthdate and initials on his neck. Matthews complained about Ingram's tattoo prices but still received a tattoo. Ingram spent about twenty minutes tattooing Matthews under good lighting.

Ingram and Swann left the apartment around 3:30 or 4:00 am, each carrying Ingram's tattoo equipment. As Ingram walked out the front door of the building, he saw a short, chunky man in a mask and a green coat. Thinking he was about to be robbed, Ingram ran back inside the building where, he testified, Matthews came up the stairwell from a lower floor wearing a half-mask covering his nose and mouth, wielding a baseball bat. In the well-lit hallway, Ingram tussled at arms-length with Matthews, recognizing appellant by his eyes and hair. Meanwhile, Ingram saw a taller, third assailant, also masked, push Swann up against the wall. Swann broke free and ran outside, where he was stopped by the original short, chunky assailant in the green coat. Ingram witnessed the taller assailant pursue Swann outside. Through a window in the door of the building, Ingram witnessed Swann struggle with the tall assailant for a silver revolver that had been produced. Ingram heard a shot and saw Swann fall. After the gunshot, Matthews fled back downstairs and out the building. Ingram followed.

Toyer testified that she witnessed Ingram and Swann leave the apartment after the party and then, sometime afterward, heard a shot. She went to the apartment window and saw co-defendants Dubose and Stevenson running toward her building from the opposite side of the street and then watched them turn and run down Robinson Place towards Stevenson's building at 2711 Robinson Place.

After leaving the building, Ingram was able to flag down U.S. Park Police Sgt. Michael Johnson, who testified that Ingram was "hysterical, excited[,]" and "screaming that his friend had been shot and they had been robbed." Ingram told Sgt. Johnson that the robbers were the people he had tattooed earlier in the evening. Ingram and Johnson returned to the scene of the crime before any other law enforcement personnel, and Sgt. Johnson testified that he found Swann's body face down when he arrived. That night, Ingram identified Matthews as one of the assailants, picking him out from a photo

---

**2.** Dubose and Stevenson were acquitted of all charges at trial and are thus not participants in this appeal.

array which contained a photo of Matthews before he received the neck tattoo from Ingram. Ingram testified that he identified Matthews by his eyes and his hair.

Meanwhile, Matthews had returned to his mother's apartment. Amekia Bartley, a resident of 2711 Robinson Place and friend of Matthews's mother, arrived the morning of March 5th at Matthews's mother's apartment and told Matthews's mother that "it was the tattoo guy [who] got killed." [3] Matthews overheard and "looked like he was shocked to hear that." Bartley testified that Matthews calmly stated that "he didn't know that they were going to kill him, the plan was for them to rob the guy."

Around 8:00 or 9:00 that morning, Toyer was taken to the police station and spoke with the police. When she returned from the police station, she saw Dubose and Stevenson. Toyer testified in her grand jury testimony that after Dubose asked her what the police wanted to know, he said, "if the police asked [Toyer] where [Dubose] was, he was in his house with his mother asleep." Toyer spoke again with Dubose on another occasion sometime between March 5th and 16th. While speaking with Dubose, Toyer noticed a bullet hole in the door of her building and asked Dubose to stand in front of it because it made her uncomfortable. She then asked Dubose how it was that two people exited a building at the same time but only one got shot. Toyer testified that Dubose responded, "because the tattoo man got hit with a bat and ran down the bottom of our steps by going to the basement of our building." Toyer asked Dubose how he knew this, considering he had previously said he was asleep in his apartment and Dubose responded that he "was in the building across the street looking." Toyer

then questioned, "but you told me you was in the house." The conversation ended at that point.

Dr. Marie–Lydie Pierre–Louis, the Chief Medical Examiner for the District of Columbia since 2004, performed Swann's autopsy. She testified that of the four gunshots to Swann, the fatal gunshot entered the left side of his chest and exited out the right side of his back. Dr. Pierre–Louis noted that the exit wound of the fatal shot exhibited "shoring," which indicated that Swann's back was against a hard surface when he was shot. Swann would have had three to five minutes of consciousness after the fatal shot. William Bruchey, a ballistics expert, testified for the defense and testified that the shoring around Swann's exit wound would be consistent with Swann being shot either against a wall or against the ground. He also testified that the absence of visible gun shot residue indicated that Swann was shot from a distance of at least two feet.

Matthews, Dubose and Stevenson were tried jointly. When Toyer testified as to the statements Dubose made to her, the trial court overruled Matthews's objection on confrontation grounds and instructed the jury that it could consider the statements only in determining Dubose's guilt, and not the guilt of Matthews or Stevenson. During the prosecution's initial closing argument, the prosecution stated that Ingram identified Matthews by his face and that, in the three to five minutes of consciousness that Swann would have had after being shot, he could have rolled over to the face down position in which Sgt. Johnson found him. Matthews objected that these statements argued facts not in evidence but the trial court overruled those objections.

---

**3.** It is unclear whether Ms. Bartley was refer- ring to Swann or Ingram.

Matthews was found guilty of conspiracy to commit robbery while armed, two counts of attempted robbery while armed, one for the attempted robbery of Swann and one for the attempted robbery of Ingram. Matthews was also found guilty of two counts of felony-murder for the death of Swann, one count based on the attempted robbery of Swann and the other count based on the attempted robbery of Ingram. He appeals (1) the admission of Dubose's statement to Toyer that Dubose witnessed Ingram get hit by the bat; (2) the prosecution's two statements in closing; (3) the sufficiency of the evidence regarding the attempted robbery of Swann; and (4) the sentencing for the two felony-murder convictions and the two attempted robbery while armed convictions.

## II. Legal Analysis

### A. The Admission of Co–Defendant Dubose's Statement

■ Appellant claims that the trial court erred in admitting co-defendant Dubose's statement to Toyer. Toyer had asked Dubose "how was two people been together and they left out the door at the same time but then only one person got shot?" Toyer, adopting her grand jury testimony, responded "[h]e said because the tattoo man ran, because the tattoo man got hit with a bat and ran down the bottom of our steps by going to the basement of our building." Toyer then asked Dubose how he knew what had happened, and Dubose responded "[b]ecause I was in the building across the street looking." Appellant claims the trial court erred in admitting this hearsay statement as a statement against penal interest and because it clearly implicated Matthews in violation of *Bruton v. United States*, 391 U.S. 123, 88 S.Ct. 1620, 20 L.Ed.2d 476 (1968).

■ In *Thomas v. United States*, 978 A.2d 1211 (D.C.2009), we set out the prop-

er inquiry for determining whether a co-defendant's out-of-court statement inculpating his co-defendants was properly admitted and, if so, whether the nondeclarant co-defendant's interests were adequately protected. First, we must determine whether the declarant co-defendant's statement was testimonial in nature, implicating the Confrontation Clause of the Sixth Amendment. *See id.* at 1225; *see also Davis v. Washington*, 547 U.S. 813, 821, 126 S.Ct. 2266, 165 L.Ed.2d 224 (2006). "[I]f a defendant's extrajudicial statement inculpating a co-defendant *is* testimonial, *Bruton* requires that it be redacted for use in a joint trial to protect the co-defendant's Sixth Amendment rights...." *Thomas, supra*, 978 A.2d at 1224 (emphasis in original). If, however, the defendant's statement "is *not* testimonial, *Bruton* does not apply...." *Id.* at 1225 (emphasis in original).

■ Even if a statement is not testimonial, and therefore outside the *Bruton* rule, the trial judge is still bound by Criminal Rule 14 to "take adequate steps to reduce or eliminate any prejudice arising from joinder." *Carpenter v. United States*, 430 A.2d 496, 503 (D.C.1981). "Specifically, we held, 'Rule 14 requires that the trial court take appropriate steps to minimize the prejudice inherent in codefendant confessions which are inadmissible against the nondeclarant defendant' even when the declarant is available for cross-examination." *Thomas, supra*, 978 A.2d at 1223–24 (quoting *Carpenter, supra*, 430 A.2d at 502). "A defendant's non-testimonial out-of-court statement therefore remains a candidate for redaction (or other remedial measures) under Criminal Rule 14 unless it fits within a hearsay exception rendering it admissible against the nondeclarant co-defendant." *Id.* at 1225.

In this case, however, we need not determine whether Dubose's statement was

testimonial, or whether his statement satisfied the hearsay exception for statements against penal interest because we find that Dubose's statement did not implicate Matthews. Our case law concerning Confrontation Clause issues and Rule 14 prejudice issues assumes that a co-defendant's out-of-court statement implicates his other co-defendants. For example, our discussion in *Thomas* presupposed a "defendant's extrajudicial statement *inculpating* a co-defendant." *Id.* at 1224 (emphasis added). Moreover, in *Carpenter*, analyzing a trial court's duties to prevent prejudice pursuant to our Rule 14, we stated, "[t]he admission of those portions of a codefendant's statement that contain inadmissible, *incriminating references* to a nonconfessing defendant is properly disfavored." *Carpenter, supra*, 430 A.2d at 505 (emphasis added); *see also Thomas, supra*, 978 A.2d at 1225 ("Whether or not it is testimonial, a defendant's extrajudicial statement *directly implicating a co-defendant* is equally susceptible to improper use by the jury against that co-defendant." (emphasis added)). Thus, our line of cases concerning potential prejudice from the admission of a co-defendant's out-of-court statement applies only when the co-defendant's statement somehow implicates his fellow co-defendants. That is not the case here.

Appellant argues that the portion of Dubose's statement stating, "the tattoo man got hit with a bat" should have been excised from Toyer's testimony because "[i]n context, Dubose [*sic* ] statement could only refer to Matthews." This is exactly the kind of contextual approach rejected by the Supreme Court in *Richardson v. Marsh*, 481 U.S. 200, 107 S.Ct. 1702, 95 L.Ed.2d 176 (1987). As explained in *Plater v. United States, Richardson* "rejected the 'contextual implication' doctrine" for determining whether the admission of a declarant co-defendant's statement implicates the nondeclarant co-defendant.[4] 745 A.2d 953, 960 (D.C.2000). "[W]here a defendant's name and any reference to the defendant's existence are eliminated from the co-defendant's extrajudicial statement, the statement is properly admitted, with limiting instructions, regardless of any inference of the defendant's guilt that arises when the statement is linked with other evidence presented at trial." *Id.* As the Supreme Court reasoned, "[w]here the necessity of such linkage is involved, it is a less valid generalization that the jury will not likely obey the instruction to disregard the evidence." *Richardson, supra*, 481 U.S. at 208, 107 S.Ct. 1702.[5]

The trial court found that Dubose's statement was not "in any way inculpatory

4. The Supreme Court in *Richardson* also acknowledged the significant practical effects that would attend extending the *Bruton* rule to situations such as these, where a co-defendant's statement is incriminating only when placed in context with other admissible evidence. The Court noted that "evidence requiring linkage differs from evidence incriminating on its face...." *Richardson, supra*, 481 U.S. at 208, 107 S.Ct. 1702.

5. We recognize that these principles "do not mean that evidence extrinsic to the statement *never* may be considered in evaluating whether the statement facially incriminates the nondeclarant co-defendant." *Thomas, supra*, 978 A.2d at 1235 (emphasis in original). Matthews contends that this means Dubose's statement must be considered in the context of evidence that Matthews was the only person alleged to have had a bat. This, however, misunderstands what *Thomas* meant by extrinsic evidence. In *Thomas*, we said that in determining whether a statement implicated a co-defendant, a court should take into consideration "[t]he circumstances surrounding the making of the extrajudicial statement that are put before the jury—when, to whom, and in whose presence it was made ...—must be considered in interpreting the words used." *Id.* The context in which a statement is made, however, is different from the statement in the context *of the trial* in which other admissible evidence is produced.

with respect to Mr. Matthews," and we agree. There was no reference to Matthews in Dubose's statement. He did not name Matthews or refer to him by any nickname. Dubose's passive statement that he witnessed "the tattoo man got hit with a bat" does not identify *any* assailant at all, much less Matthews. There was simply nothing here to redact. Dubose's statement "does not incriminate a nonde-clarant co-defendant on its face, either explicitly or by direct and obvious implication." *Thomas, supra*, 978 A.2d at 1235 (emphasis omitted).

■ Dubose's statement was clearly admissible against Dubose, the declarant, as an admission of a party opponent. *See Harris v. United States*, 834 A.2d 106, 115–16 (D.C.2003). Additionally, Dubose's statement was admitted only against Dubose. The trial court instructed the jury twice, once immediately after Toyer's testimony and once again after the close of trial, that the statement could be used only to assess Dubose's responsibility for the crime, not Matthews's. Thus, because Dubose's statement did not implicate Matthews—thereby allaying any confrontation or prejudice concerns—and the trial court twice instructed the jury that Toyer's testimony about Dubose's statement could be used only in assessing Dubose's guilt or innocence, we conclude that the trial court did not err in admitting Dubose's statement to Toyer.

### B. Prosecution's Closing Argument

Appellant claims that in his closing argument, the prosecution argued facts that were not in evidence. Specifically, appellant objected to the prosecution's statement that Ingram identified Matthews as his attacker by his facial features, and that Swann may have rolled over on the ground after being shot. For the reasons stated below, we find the trial court did not err in permitting the prosecution's statements.

■■ To evaluate claims that a prosecutor argued facts not in evidence, "we first must determine whether the challenged arguments were improper. If so, and if [defendant] made a timely objection, then we must determine whether the error was harmless under the familiar *Kotteakos* test...." *Clayborne v. United States*, 751 A.2d 956, 968 (D.C.2000).[6] We are mindful, however, that "the trial court has latitude in regulating closing argument, and we do not lightly overturn its discretionary rulings." *Id.* "Deciding whether a comment made by counsel is a 'reasonable inference' or 'impermissible speculation,' ... is usually a task best suited to the trial judge, who is 'on the spot' and has 'a vantage point superior to ours.'" *Gardner v. United States*, 698 A.2d 990, 1001 (D.C. 1997) (quoting *Mills v. United States*, 599 A.2d 775, 785 (D.C.1991)).

■ "In closing argument the prosecutor ... 'may not present new evidence or rely on evidence that has not been presented.' Counsel is entitled to make 'reasonable comments on the evidence,' and to 'argue all reasonable inferences from the evidence adduced at trial.'" *Clayborne, supra*, 751 A.2d at 969 (internal citations omitted); *see also Washington v. United States*, 884 A.2d 1080, 1090 (D.C. 2005). In this instance, we find that the prosecution's arguments were permissible and supported by the evidence and reasonable inferences therefrom.

#### 1. Statement About Ingram Identifying Matthews by his Face

■ In their initial closing, the prosecution stated that after Ingram picked out Matthews in a photo array, "he says, I

6. It is uncontested that appellant preserved these issues by making timely objections.

remember him because I got a good look at his face because I gave him a tattoo." Appellant contends this statement presented facts not in evidence because "Mr. Ingram never said he recognized Mr. Matthews by his face. He said he recognized him by his eyes." The trial court found the prosecution's statement permissible, stating, "there's not much difference between somebody saying they recognize somebody by their face and somebody by their eyes. If we had to parse words like that a trial that's error free would be an impossibility."

We agree that the prosecution's statement was supported by the evidence. The statement was supported by Ingram's testimony that he had spent twenty minutes giving Matthews a tattoo on his neck in good lighting, that he was only arms-length from his assailant in a well-lit hallway, and that he recognized the eyes and hair of the man who attacked him. Moreover, when Ingram identified Matthews from a photo array (which contained a photograph of Matthews before he received his tattoo), he said he recognized Matthews "by how he looked." From this evidence, it is clearly a reasonable inference that Ingram "got a good look at [Matthews's] face because [he] gave him a tattoo." We do not require the kind of exactitude in closing arguments that appellant seeks.

### 2. Statement About Possibility of Swann Rolling Over

■ Appellant challenges another statement made by the prosecution in its initial closing argument. In referring to a photo depicting the positioning of Swann's body, the prosecution states, "Now, of course, Mr. Swann was not in that position when he was shot and died.... We know that ... the paramedics had moved him and certainly we know that after he was shot it was three to five minutes before he lost consciousness. He could be moving around, roll over, anything like that could have happened." The trial court determined that, "even though no one may have seen [Swann] roll over," the prosecution's argument was not based on facts not in evidence. We agree.

The prosecution's statement was based on Dr. Pierre–Louis's testimony that the fatal gun shot wound entered Swann's chest and exited out his back, where the exit wound exhibited "shoring," which indicated that Swann's back was against a hard surface when he was shot, and that Swann would have had three to five minutes of consciousness after the fatal shot. Mr. Bruchey, a ballistics expert for the defense, testified that the hard object that caused the shoring could have been either the building wall or the ground. Sgt. Johnson testified that Swann was originally lying face down when he arrived. The theory that Swann was shot on the ground and then could have rolled over reconciles evidence that Swann was shot in his chest while against a hard surface, had three to five minutes of consciousness and was subsequently found by medical personnel lying face-down. The prosecution's theory is thus supported by rational inferences from the evidence and did not extend into "impermissible speculation."[7] See Clayborne, supra, 751 A.2d at 969.

### C. Sufficiency of the Evidence

■ In determining whether there was sufficient evidence to support Mat-

---

7. Moreover, the prosecution made clear that they were advancing their theory of the crime and did not argue as fact that Swann rolled over. The prosecution emphasized "He could be moving around, roll over, anything like that could have happened ... he could have done anything." (emphasis added).

thews's conviction for the attempted robbery while armed of Swann, we " 'must review the evidence in the light most favorable to the government, giving full play to the right of the jury to determine the credibility, weigh the evidence, and draw justifiable inferences of fact, and drawing no distinction between direct and circumstantial evidence.' " *Timberlake v. United States*, 758 A.2d 978, 980 (D.C.2000) (quoting *Curry v. United States*, 520 A.2d 255, 263 (D.C.1987)). "To prevail on an insufficiency claim, an appellant must establish 'that the government presented no evidence upon which a reasonable mind could find guilt beyond a reasonable doubt.' " *Carter v. United States*, 957 A.2d 9, 14 (2008) (quoting *Peery v. United States*, 849 A.2d 999, 1001 (D.C.2004)). In this instance, we find sufficient evidence for the jury to convict Matthews of the attempted robbery while armed of Swann.

▇▇▇▇ Appellant contends that "in this case there was no evidence, direct or circumstantial of intent to rob Swann."[8] We disagree. " '[I]t is well established that the jury may infer the intent to rob from the totality of the evidence.' " *Id.* at 15 (quoting *Singleton v. United States*, 488 A.2d 1365, 1367 (D.C.1985)). We consider both the appellant's words and actions to assess intent. *See Owens v. United States*, 497 A.2d 1086, 1090 (D.C.1985). It is not necessary for the defendant to "announce his intent," *id.*, nor is it necessary for the defendant to use any magical language demanding money, *see Abdus–Price v.*

*United States*, 873 A.2d 326, 333 n. 8 (D.C. 2005).

In this case, Ingram testified that people were paying for his tattooing services in cash and that he was then putting the money in his pockets while the partygoers were around him. He estimated that he collected $1000 for his work that evening. A witness testified at one point that appellant complained that he thought Ingram's prices were too high. Swann arrived with Ingram and, when the two left, helped carry Ingram's equipment. Ingram also testified that Swann would sometimes assist him at tattoo parties by showing designs to potential customers and knew "where to look for certain things." Finally, Bartley testified that, when appellant heard that the "tattoo guy" had been shot and killed, Matthews stated that "he didn't know that they were going to kill him, the plan was for them to rob the guy." Considering that Ingram had been handling money openly at the party, that Swann and Ingram arrived and left together, that Swann assisted Ingram during the night, and appellant's statement that "the plan was for them to rob the guy," a reasonable juror could conclude that Matthews intended to rob Swann because it was reasonable to infer that Swann was an assistant or employee of Ingram and might have some of the tattoo earnings on his person. Thus, the evidence was sufficient for the jury to find Matthews guilty of the attempted robbery while armed of Swann.

8. The entirety of appellant's argument consists of two sentences stating, "There was absolutely no evidence that anyone attempted to rob Swann. While circumstantial evidence can be used to prove intent to commit robbery, in this case there was no evidence, direct or circumstantial of intent to rob Swann." We interpret this minimalist argument to challenge only whether there was sufficient evidence to prove Matthews had the requisite intent to rob Swann. If appellant intended to challenge the sufficiency of the evidence regarding the remaining elements, he has failed to adequately brief them and so we consider them waived. *Wagner v. Georgetown Univ. Med. Ctr.*, 768 A.2d 546, 554 (D.C. 2001) ("It is not enough to merely mention a possible argument in the most skeletal way, leaving the court to do counsel's work, create the ossature for the argument, and put flesh on its bones ...." (quoting *United States v. Zannino*, 895 F.2d 1, 16 (1st Cir.1990))).

## D. Merger of Convictions and Sentences

Appellant contends that some of his convictions must merge. Matthews was convicted, *inter alia*, of attempted robbery while armed of Swann, first degree felony murder while armed involving the killing of Swann during an attempted robbery of Swann, attempted robbery while armed of Ingram, and first degree felony murder while armed involving the killing of Swann during an attempt to commit robbery of Ingram. As appellant notes, and the prosecution concedes, some of these convictions must merge.

■■■■ One of the felony murder convictions must be vacated. *See Garris v. United States*, 465 A.2d 817, 823 (D.C. 1983) ("[W]here one killing is involved, and the government advances alternate theories of felony murder based upon more than one underlying felony, the accused may not be convicted of more than one felony murder."); *see also Downing v. United States*, 929 A.2d 848, 864 (D.C. 2007); *Thacker v. United States*, 599 A.2d 52, 63 (D.C.1991) ("When there is only one killing, the defendant may not be convicted of more than one murder."). Additionally, the court must vacate the attempted robbery while armed conviction which underlies the remaining felony murder conviction because a person cannot be convicted of *both* felony murder *and* the underlying felony that supported the felony murder conviction. *See Thacker, supra,* 599 A.2d at 63 ("[T]he felony murder convictions merge with the underlying felonies."); *Garris, supra,* 465 A.2d at 823. We thus remand to the trial court with instructions to vacate one of the felony murder convictions and to vacate the attempted robbery conviction supporting the remaining felony murder conviction.

## III. Conclusion

For the foregoing reasons, we find that (1) the trial court did not err in admitting Dubose's statement to Toyer because it did not implicate Matthews and the court gave a proper limiting instruction; (2) the trial court did not err in permitting the prosecution's closing remarks which were based on the evidence and rational inferences therefrom; (3) there was sufficient evidence that Matthews had the requisite intent to be convicted of the armed robbery while armed of Swann; and (4) one of Matthews's felony murder convictions must be vacated and the attempted robbery while armed conviction which underlies the remaining felony murder conviction must be vacated as the convictions merge.

*Remanded to vacate convictions consistent with this opinion, affirmed on all other grounds.*