# District of Columbia Court of Appeals

**No. 13-CF-1312**

MARLON WILLIAMS,

                Appellant,

v.

UNITED STATES,

                Appellee.



**CF1-18032-10**

On Appeal from the Superior Court of the District of Columbia
Criminal Division

BEFORE: Thompson and Easterly, Associate Judges; and Nebeker, Senior Judge.

## JUDGMENT

This case came to be heard on the transcript of record, the briefs filed, and was argued by counsel. On consideration whereof, and as set forth in the opinion filed this date, it is now hereby

ORDERED and ADJUDGED that the case is remanded with instructions for the trial court to vacate appellant's convictions for attempted robbery and the associated count of possession of a firearm during a crime of violence ("PFCV"). In all other respects, the judgment of the trial court is affirmed.

For the Court:

*Julio A. Castillo*

JULIO A. CASTILLO
Clerk of the Court

Dated: January 21, 2016.

Opinion by Associate Judge Catharine Easterly.

Concurring opinion by Associate Judge Catharine Easterly.

*Notice: This opinion is subject to formal revision before publication in the Atlantic and Maryland Reporters. Users are requested to notify the Clerk of the Court of any formal errors so that corrections may be made before the bound volumes go to press.*

# DISTRICT OF COLUMBIA COURT OF APPEALS

No. 13-CF-1312

FILED 1/21/16
District of Columbia
Court of Appeals

Julio Castillo
Clerk of Court

MARLON WILLIAMS, APPELLANT,

V.

UNITED STATES, APPELLEE.

Appeal from the Superior Court
of the District of Columbia
(CF1-18032-10)

(Hon. Russell F. Canan, Trial Judge)

(Argued September 29, 2015                    Decided January 21, 2016)

*Enid Hinkes* for appellant.

*John Cummings*, Assistant United States Attorney, with whom *Ronald C. Machen, Jr.*, United States Attorney at the time the brief was filed, *Elizabeth Trosman*, *John P. Mannarino*, and *Gary Wheeler*, Assistant United States Attorneys, were on the brief, for appellee.

Before THOMPSON and EASTERLY, *Associate Judges*, and NEBEKER, *Senior Judge*.

Opinion for the court by *Associate Judge* EASTERLY. Concurring opinion by *Associate Judge* EASTERLY at page 16.

EASTERLY, *Associate Judge*: Marlon Williams was arrested and prosecuted for the shooting death of Min Soo Kang. As no eyewitnesses to the crime were discovered and as Mr. Williams had no known relationship with Mr. Kang, it took a number of investigative steps for the police to connect Mr. Williams with the crime: after finding Mr. Kang's body, the police located his car; after examining fingerprints recovered from Mr. Kang's car, the police identified Mr. Williams as a potential suspect; and after searching Mr. Williams's apartment, the police recovered a gun that, when test-fired, left markings on the bullets that appeared to match the markings on bullets recovered from Mr. Kang's car. This evidence, in conjunction with the testimony of an individual to whom Mr. Williams had made incriminating statements while they were in the courthouse cellblock, formed the bulk of the government's case. After considering this evidence, a jury convicted Mr. Williams of first-degree felony murder while armed,[1] attempt to commit robbery while armed,[2] two counts of possession of a firearm during a crime of violence (PFCV),[3] and carrying a pistol without a license.[4] He received an aggregate sentence of 480 months' imprisonment.

---

[1] D.C. Code §§ 22-2101, -4502 (2001).

[2] D.C. Code §§ 22-2802, -4502, -1801 (2001).

[3] D.C. Code § 22-4504 (b) (2001).

[4] D.C. Code § 22-4504 (a) (2001).

On appeal Mr. Williams primarily attacks the firearms and toolmark evidence presented against him, arguing among other things that, although defense counsel never objected, the examiner should not have been permitted to testify that the markings on the bullets recovered from Mr. Kang's car were "unique" to the gun recovered from Mr. Williams's apartment and thus that he did not have any doubt of their source. Because, to date, this court has only assumed without deciding that such testimony of absolute certainty is impermissible, we conclude that Mr. Williams has failed to establish that it was plain error for the trial court to permit the jury to hear it. We discern no other error warranting reversal, although we agree that Mr. Williams's attempted robbery conviction and associated PFCV conviction merge with his felony murder conviction and must be vacated.

## I.    Facts

In the early morning hours of September 13, 2010, the bullet-riddled body of Min Soo Kang was discovered lying on the side of the road in Southeast D.C. The Metropolitan Police Department (MPD) began investigating and learned that Mr. Kang drove a Cadillac Escalade equipped with OnStar, a service that could remotely disable the vehicle. At MPD's request, OnStar disabled Mr. Kang's

Escalade by the evening of September 13 and directed MPD officers to the vehicle's location in Northeast D.C.

An MPD officer inspected the Escalade. He found no damage to the exterior of the car but discovered what he suspected were bullet holes in the backrest of the driver's seat. The officer cut into the seat and recovered three bullets. He also collected fingerprints from the Escalade.

An MPD fingerprint examiner entered the fingerprints lifted from the Escalade into the national Automated Fingerprint Identification System (AFIS), which connects unknown prints to known prints in a digital database. AFIS identified Mr. Williams as a possible source of the fingerprints. Based on the fingerprint examiner's preliminary conclusion that the prints on the Escalade belonged to Mr. Williams, MPD applied for and was granted a search warrant for Mr. Williams's residence. Executing this warrant, MPD officers recovered a High Point brand firearm from Mr. Williams's bedroom.

At trial,[5] the government relied almost exclusively on forensic evidence, presenting expert testimony from a fingerprint examiner and a firearms and toolmark examiner.[6] The fingerprint examiner testified to his conclusion that the prints recovered from the Escalade belonged to Mr. Williams. The firearms and toolmark examiner, Luciano Morales, testified on direct examination that when a bullet is fired from a particular gun, the gun leaves "unique" identifying marks, "similar to a fingerprint, basically." He then testified that he had compared the markings on the bullets recovered from Mr. Kang's car with the markings on the bullets test-fired from the gun recovered from Mr. Williams's apartment (manufactured by High Point and admitted as Exhibit No. 58), and he had concluded that the bullets were fired by the same gun. On redirect, when the prosecutor asked whether there was "any doubt in [his] mind" that the bullets recovered from Mr. Kang's Escalade were fired from the gun found in

---

[5] This was Mr. Williams's second trial; the first trial ended in a mistrial after the jury was unable to reach a verdict.

[6] The government also called a witness who had agreed to testify against Mr. Williams in return for the government's assistance at the witness's pending sentencing for aggravated assault, a charge carrying up to thirty years imprisonment. The witness testified that, after he met Mr. Williams for the first time in the cellblock at the courthouse, Mr. Williams told the witness that he was "fighting a body"; that the police had recovered his fingerprints from the victim's car even though he had tried to wipe it clean; that the police had recovered a gun, but he had wiped his prints off the gun; and that "it was in his favor" that the police had not tested bullets recovered from the victim to see if they matched bullets fired from his gun.

Mr. Williams's room, the examiner responded, "[n]o sir." He elaborated that "[t]hese three bullets were identified as being fired out of Exhibit No. 58. And it doesn't matter how many firearms High Point made. Those markings are unique to that gun and that gun only." The prosecutor then asked the examiner whether, "judging from the markings that you find in 58, it's your conclusion that those three bullets were fired from 58?" The examiner was unequivocal: "Item Number 58 fired these three bullets."

Counsel for Mr. Williams did not object to any of this testimony. The jury also heard stipulations that a print lifted from the gun did not match Mr. Williams and that the blood and DNA recovered from the gun did not match Mr. Kang or Mr. Williams. The jury convicted Mr. Williams on all charges.

## II.    Analysis

### A.    Sufficiency of the Evidence

We first address Mr. Williams's argument that the government did not present sufficient evidence to support his felony murder conviction because it failed to establish the underlying felony of attempted robbery, and specifically

failed to prove that Mr. Williams, and not another person, had stolen Mr. Kang's Escalade. Reviewing the sufficiency of the evidence de novo, *Nero v. United States*, 73 A.3d 153, 157 (D.C. 2013), we disagree. As Mr. Williams acknowledges in his brief, the government presented the following evidence to support an attempted robbery conviction: (1) testimony by the fingerprint examiner that the fingerprints lifted from both the exterior and interior of Mr. Kang's Escalade matched Mr. Williams; (2) eyewitness testimony that a person consistent with Mr. Williams's physical description was seen opening and closing the hood of the Escalade around the time it was disabled; and (3) testimony by the firearms and toolmark examiner that the bullets recovered from the Escalade matched bullets fired from Mr. Williams's gun. From this evidence, drawing all reasonable inferences in favor of the government as we must, *Nero*, 73 A.3d at 157, we conclude that the jury reasonably could have determined that Mr. Williams stole Mr. Kang's car, and thus necessarily committed the crime of attempted robbery.[7] *See Ray v. United States*, 575 A.2d 1196, 1199 (D.C. 1990) ("Every completed

---

[7] We question whether the government presented sufficient evidence that Mr. Williams intended to steal Mr. Kang's car before he shot him. *See Head v. United States*, 451 A.2d 615, 625 (D.C. 1982) ("[M]ere coincidence in time of a robbery and a murder is insufficient to support a felony murder conviction."); *see also United States v. Bolden*, 514 F.2d 1301, 1307 (D.C. Cir. 1975) (holding that the intent to rob must be formed before the homicide to convict a defendant of felony murder). But Mr. Williams did not raise that argument on appeal.

criminal offense necessarily includes an attempt to commit that offense."). *But see* (*Richard*) *Jones v. United States*, 124 A.3d 127, 132-34 (D.C. 2015) (Beckwith, J., concurring) (highlighting conflicting precedent from this court indicating that for general intent crimes, an attempt conviction requires proof of a higher mens rea than conviction for the completed offense).

### B. The Firearms and Toolmark Examiner's Opinion Testimony

Mr. Williams argues that the firearms and toolmark examiner should not have been able to testify that the markings on the bullets recovered from Mr. Kang's Escalade were unique or that he was without "any doubt" that these bullets were fired from the gun found in Mr. Williams's room. Because Mr. Williams did not object at trial to this testimony, we review only for plain error. *See* (*John*) *Jones v. United States*, 990 A.2d 970, 980-81 (D.C. 2010). To prevail under this test, it is not enough for an appellant to demonstrate error; the appellant must also show that the error is plain, i.e., that the error is "so egregious and obvious as to make the trial judge and prosecutor derelict in permitting it, despite the defendant's failure to object." *Id.* at 981. We attribute such dereliction to the trial court only

when an error is "clear under current law."[8] *Conley v. United States*, 79 A.3d 270, 289 (D.C. 2013) (quoting *United States v. Olano*, 507 U.S. 725, 734 (1993)). Applying this standard, we cannot say the trial court plainly erred by permitting the jury to hear the examiner's certainty statements.

There is no precedent in this jurisdiction that limits a toolmark and firearms examiner's testimony about the certainty of his pattern-matching conclusions. The closest this court has come to addressing this issue was in (*Ricardo*) *Jones v. United States*, 27 A.3d 1130 (D.C. 2011). In that case the defense argued *inter alia* that toolmark and firearms examiners could not "stat[e] their conclusions with 'absolute certainty excluding all other possible firearms.'" *Id*. at 1138. In response, the government assured this court, both in its appellate brief and at oral argument, that it was the government's policy not to present such testimony. "In light of the government's representation," this court "assume[d], without deciding, that such experts should not be permitted to testify that they are 100% certain of a match, to the exclusion of all other firearms." *Id.* at 1139. The court then determined that any such error was harmless. *Id. Jones* did not plainly bar the

___

[8] This assessment is made by examining the state of the law at the time of appellate review. *Henderson v. United States*, 133 S. Ct. 1121, 1127 (2013). *Accord*, *Muir v. District of Columbia,* No. 11-CT-1619, 2016 WL 187941, at *1, *6-7 (D.C. Jan. 14, 2016).

toolmark examiner in this case from testifying as he did and does not provide a foundation for a determination of plain error.

Nor can we say that the weight of non-binding authority outside this jurisdiction is a sufficient foundation for a determination that the trial court "plainly" erred by not sua sponte limiting the toolmark examiner's testimony. *See Euceda v. United States*, 66 A.3d 994, 1012 (D.C. 2013) (holding that error cannot be plain where neither this court nor the Supreme Court has decided the issue, and other courts are split on the issue). We are aware of only one state supreme court decision[9] and no federal appellate decisions limiting the opinion testimony of firearms and toolmark examiners. Indeed, as one federal district court judge has observed, "[a]lthough the scholarly literature is extraordinarily critical" of toolmark pattern-matching, it appears that courts have made little effort to limit or qualify the admission of such evidence.[10] *United States v. Green*, 405 F. Supp. 2d 104, 122 (D. Mass. 2005).

---

[9] *Commonwealth v. Heang*, 942 N.E.2d 927, 944-45 & n.29 (Mass. 2011).

[10] Even in the absence of binding precedent or a raft of persuasive authority on point, we may find plain error where a trial court acts in contravention of "well-settled legal principles." *See Conley*, 79 A.3d at 290 ("'[P]lainness' of [an] error can depend on well-settled legal *principles* as much as well-settled legal *precedents*." (quoting *United States v. Brown*, 352 F.3d 654, 664 (2d Cir. 2003))). Mr. Williams has made no argument that the trial court plainly erred on this basis.

Mr. Williams refers us to the policy representation made by the government in *Jones*. The government concedes that, at Mr. Williams's trial, it violated its policy "to only elicit firearms examiners' opinions to a reasonable degree of scientific certainty." But this concession cannot serve as the sole foundation for a determination of plain error. The government's internal policy does not constitute binding law[11]—let alone a "clear" or "obvious" rule—that a trial court should be presumed to know.[12] *Cf. Rose v. United States*, 49 A.3d 1252, 1256, 1258 (D.C. 2012) (holding that a trial court's error could not be plain when there was "no clear

---

[11] Moreover, we question whether this court would want to endorse a policy of "only elicit[ing] firearms examiners' opinions to a reasonable degree of scientific certainty," in light of criticism that firearms examination does not involve any "scientific" measure of certainty. *See* NATIONAL RESEARCH COUNCIL, COMMITTEE ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIENCES COMMUNITY, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD 154-55 (2009); NATIONAL RESEARCH COUNCIL, COMMITTEE TO ASSESS THE FEASIBILITY, ACCURACY, AND TECHNICAL CAPABILITY OF A NATIONAL BALLISTICS DATABASE, BALLISTIC IMAGING 3, 81-82 (2008).

[12] Mr. Williams appears to concede that *Jones* itself did not plainly establish that statements of absolute certainty were prohibited and argues instead that "because of its prior assurances" in *Jones*, the government should be estopped from arguing that the admission of certainty statements of the sort elicited in this case is not plain error. But the government in *Jones* never took a position as to plain error review (because the challenge to the firearms and toolmark examiner's testimony was preserved). Meanwhile, in this appeal, the government has not disavowed its policy and concedes it was violated at Mr. Williams's trial. *Ward v. Wells Fargo Bank, N.A.*, 89 A.3d 115, 126-27 (D.C. 2014) (reviewing the elements of judicial estoppel and explaining *inter alia* that it will apply only if the party's later position is clearly inconsistent with its earlier position).

case law" in our jurisdiction and that a published concurrence from a judge of this court, while on point, "is not the law of our jurisdiction").

Since Mr. Williams has not shown that the state of the law is such that the trial court plainly should have sua sponte precluded or struck the certainty statements of the firearms and toolmark examiner in this case, Mr. Williams's unpreserved challenge to these certainty statements cannot prevail under our test for plain error.

### C. Confrontation Clause and Hearsay Challenges to the Firearms and Toolmark Evidence

Regarding the firearm and toolmark evidence presented in this case, Mr. Williams also challenges the admission, over objection, of two "worksheets" documenting the analysis of the bullets. These worksheets were signed by the firearms and toolmark examiner who testified at trial, Mr. Morales, but they also bore the signature and initials of his colleague, the "lead examiner on that particular case," Rosalyn Brown.[13] The government did not call Ms. Brown to

---

[13] Mr. Morales explained that the lead examiner is "basically the examiner that's assigned and responsible for the examination" of toolmarks; he was designated the "second examiner." He further explained that, at the time the firearms evidence was received, Ms. Brown "was not available; it was early in the

(continued…)

testify because she had since been fired. On appeal, Mr. Williams argues that the admission of the worksheets violated his Sixth Amendment right to confrontation.

The Confrontation Clause of the Sixth Amendment, U.S. CONST. amend. VI, prohibits the government from introducing "testimonial" hearsay at a criminal trial, unless the declarant is unavailable and the defendant has had a prior opportunity to cross-examine him. *Crawford v. Washington*, 541 U.S. 36, 53-54 (2004). A hearsay statement is considered testimonial if it is "'a solemn declaration or affirmation made for the purpose of establishing or proving some fact' . . . in the prosecution or investigation of a crime." *Young v. United States*, 63 A.3d 1033, 1039-40 (D.C. 2013) (quoting *Crawford*, 541 U.S. at 51). Forensic evidence is also subject to the Confrontation Clause, which means a defendant must have an opportunity to cross-examine the analyst who actually conducted or observed the forensic testing. *Id.* at 1039.

Assuming the ballistics worksheets contained Ms. Brown's testimonial hearsay statements, we conclude that their erroneous admission was harmless. *See Duvall v. United States*, 975 A.2d 839, 843 (D.C. 2009) (applying the test for

---

(…continued)

morning." "[S]ince I was the second, I was the reviewer . . . of that case. My responsibility was to perform the examination between the items."

harmless error under *Chapman v. California*, 386 U.S. 18 (1967) to admission of a lab report in violation of the Confrontation Clause).  To begin with, the jury never heard any testimony about Ms. Brown's observations and conclusions in Mr. Williams' case and thus had no reason to think that the worksheets might document her examination of the bullet and firearm evidence.  On the contrary, Mr. Morales testified (without "any doubt", *see supra* Part II.B) only as to his own observations and conclusions.  Meanwhile, the prosecution made no reference to another examiner in closing or rebuttal.  Lastly, nothing on the worksheets themselves indicated that they reflected the independent conclusions of another, absent examiner.  Thus, at most, the jury saw an ambiguous extra signature at the bottom of a document that Mr. Morales had testified reflected his work product.  Based on these particular facts, we cannot discern any harm to Mr. Williams from admission at his trial of these worksheets.[14]

---

[14] Mr. Williams additionally contends that he was deprived of his Sixth Amendment right to a jury trial because Mr. Morales gave overly conclusory testimony, failed to present the images or other "documentation" underlying his opinions, and "deprived the jury of the ability to make a decision based on the evidence."  Again, this argument was never made in the trial court and we review for plain error.  We discern none.  We acknowledge that at least one federal district court has ruled that the government's presentation of pattern-matching testimony by a forensic expert is contingent on its presentation of sufficient documentation to permit the jury to meaningfully evaluate the expert's subjective conclusions.  *See United States v. Glynn*, 578 F. Supp. 2d 567, 574 n.13 (S.D.N.Y. 2008); *see also Heang*, 942 N.E.2d at 945 n.30 (urging but not requiring firearms and toolmark

(continued…)

**D.     Other Issues**

With one exception, Mr. Williams's remaining arguments fail. His unpreserved challenge to the admission of fingerprint evidence fails the third prong of the test for plain error where trial counsel conceded, both in opening and in closing, that the fingerprints on the Escalade belonged to Mr. Williams.[15] Mr. Williams's new argument that he is entitled to a *Franks* hearing[16] also fails; the trial court did not plainly err by overlooking the discrepancy between the affidavit in support of the search warrant for Mr. Williams's apartment, which cited fingerprint evidence as a basis for probable cause, and the fingerprint examiner's testimony that he reviewed the prints and linked them to Mr. Williams on a date after the search warrant was executed. Instead, given other documentation indicating that the fingerprint examiner was asked to analyze the latent prints before the police sought and obtained the warrant, it would have been reasonable

---

(…continued)

examiners to "explain the basis of any opinion with sketches, photographs, or, best of all, comparison photographs"). But, to date, this court has not so held.

[15] *Conley*, 79 A.3d at 276, 290 (explaining that the third prong of the plain error standard requires the appellant to identify an error that "affected his substantial rights"). In light of our above resolution of Mr. Williams's challenges to the toolmark and fingerprint evidence, we reject Mr. Williams's argument that the trial court's cumulative errors regarding the admission of the government's toolmark and fingerprint evidence require reversal.

[16] *Franks v. Delaware*, 438 U.S. 154 (1978).

for the trial court to conclude that the examiner was simply mistaken as to the date on which he first examined the latent prints and connected them to Mr. Williams.

Mr. Williams prevails on his argument that this court must merge his attempted robbery and corresponding PFCV conviction with his felony murder conviction. "[A] person cannot be convicted of *both* felony murder *and* the underlying felony that supported the felony murder conviction." *Matthews v. United States*, 13 A.3d 1181, 1191 (D.C. 2011). Accordingly, we remand the case with instructions for the trial court to vacate Mr. Williams's convictions for attempted robbery and the associated count of PFCV. *See Morris v. United States*, 622 A.2d 1116, 1130 (D.C. 1993) (holding that when two predicate crimes for PFCV merge into one, the PFCV offenses also merge).

In all other respects, we affirm the judgment of the trial court.

*So ordered*.

EASTERLY, *Associate Judge*, concurring: In our adversarial system, we do not expect trial courts to "recognize on [their] own" that an expert's testimony is "scientifically unorthodox or controversial." (*John*) *Jones v. United States*, 990

A.2d 970, 980-82 (D.C. 2010). In the absence of any objection at Mr. Williams's trial to the admission of the firearms and toolmark examiner's certainty statements, we could only reverse if the law were clear that the expert could not make these statements. *See supra* Majority Opinion, Part II.B. As discussed above, the law in this jurisdiction does not clearly preclude a firearms and toolmark examiner from testifying with unqualified, absolute certainty.[1] But it should.

A statement that markings on a bullet are "unique" to a particular gun is a statement that the probability of finding another gun that can create identical bullet markings is zero. If purportedly unique patterns on bullets are declared a match, that declaration likewise negates the possibility that more than one gun could have fired the bullets—it is a statement of unqualified certainty that the bullets were fired from a specific gun to the exclusion of all others. Here the firearms and toolmark examiner testified that he had identified matching "unique" patterns; he also declared that he did not have "any doubt" that the bullets recovered from Mr. Kang's car had been fired by the gun recovered from Mr. Williams's apartment.

---

[1] To avoid the constraints of plain error review, Mr. Williams could have filed a motion under D.C. Code § 23-110 and argued that trial counsel provided him constitutionally ineffective assistance by failing to challenge the firearms and toolmark examiner's certainty statements as scientifically unfounded. *See infra.* Mr. Williams did not do this.

The government has a policy, admittedly violated here, not to elicit such certainty statements. This court was advised of the government's policy in *Jones*. At oral argument in that case, in November 2011, counsel for the government stated that, as "concede[d]" in its brief, it was the government's "position that practitioners should not state their conclusions to 100% scientific certainty." The government further noted that it had "conceded in every hearing, starting two to three years ago when we first started having *Frye* hearings on this issue, that firearms examiners should not state their conclusions with absolute certainty."[2] *Id*. Which raises the question: why did the government adopt a policy to limit the opinion testimony of firearms and toolmark examiners? What happened "two to three" years before the *Jones* oral argument that prompted the creation of this policy?

In 2008, a committee of scientists and statisticians assembled by the National Research Council (NRC),[3] which was in turn acting at the behest of the

---

[2]    The government was represented in *Jones* by the Special Counsel for DNA and Forensic Evidence at the United States Attorney's Office for the District of Columbia; this Special Counsel has corresponded on the government's behalf with Superior Court regarding other problems arising from the reliance on faulty forensic evidence. *See infra* note 10.

[3]    The NRC is a component of the National Academy of Sciences, which was created by congressional charter in 1863 to "investigate, examine, experiment,

(continued…)

Department of Justice, issued a report on bullet pattern-matching analysis, *Ballistic Imaging.*[4] Although the NRC Committee's charge was to assess the feasibility and utility of establishing "a national reference ballistic image database . . . that would house images from firings of all newly manufactured or imported firearms," it recognized that the "[u]nderlying . . . question" is "whether firearms-related toolmarks are unique: that is, whether a particular set of toolmarks can be shown to come from one weapon to the exclusion of all others." *Ballistic Imaging*, *supra* note 3, at 1, 3. The NRC Committee determined that there was no data-based foundation to declare, with any certainty, individualization based on toolmark pattern matching.

Specifically, the NRC Committee made a "finding" that the "validity of the fundamental assumptions of uniqueness and reproducibility of firearms-related

---

(…continued)
and report upon any subject of science." Act to Incorporate the National Academy of Sciences, sec. 3, 12 Stat. 806 (1863), http://www.nasonline.org/about-nas/leadership/governing-documents/act-of-incorporation.html. The NRC was established in 1916 "to associate the broad community of science and technology with the Academy's purposes of furthering knowledge and advising the federal government." NATIONAL RESEARCH COUNCIL, COMMITTEE TO ASSESS THE FEASIBILITY, ACCURACY, AND TECHNICAL CAPABILITY OF A NATIONAL BALLISTICS DATABASE, BALLISTIC IMAGING iii (2008).

[4] *Ballistic Imaging*, *supra* note 3. Specifically, the project was sponsored by the National Institute of Justice (NIJ), Office of Justice Programs, U.S. Department of Justice. *Id*. at xi.

toolmarks has not yet been fully demonstrated." *Ballistic Imaging*, *supra* note 3, at 3, 81. The NRC Committee noted that "derivation of an objective, statistical basis for rendering decisions [about matches] is hampered by the fundamentally random nature of parts of the firing process. The exact same conditions—of ammunition, of wear and cleanliness of firearms parts, of burning of propellant particles and the resulting gas pressure, and so forth—do not necessarily apply for every shot from the same gun." *Id.* at 55. The NRC Committee concluded that "[a] significant amount of research would be needed to scientifically determine the degree to which firearms-related toolmarks are unique or even to quantitatively characterize the probability of uniqueness." *Id.* at 3, 82.

The NRC Committee further expressed concern that, notwithstanding the absence of data and the corresponding statistical unknowns, firearms and toolmark examiners "tend to cast their assessments in bold absolutes, commonly asserting that a match can be made 'to the exclusion of all other firearms in the world.'" *Ballistic Imaging*, *supra* note 3, at 82. The NRC Committee denounced this sort of testimony, explaining that "[s]uch comments cloak an inherently subjective assessment of a match with an extreme probability statement that has no firm grounding and unrealistically implies an error rate of zero." *Id.* "[S]topping short of commenting on whether firearms toolmark evidence should be admissible" in

court, the NRC Committee determined that "[*c*]*onclusions drawn in firearms identification should not be made to imply the presence of a firm statistical basis when none has been demonstrated.*" *Id*. (emphasis in original).

In a subsequent report commissioned by Congress and issued in 2009, *Strengthening Forensic Science in the United States: A Path Forward*,[5] another NRC Committee published similar words of warning regarding firearms and toolmark evidence.[6] This Committee explained that "[i]ndividual patterns from manufacture or from wear might, in some cases, be distinctive enough to *suggest* one particular source." *Id*. at 154 (emphasis added). But "[b]ecause not enough is known about the variabilities among individual tools and guns," the Committee was "not able to specify how many points of similarity are necessary for a given level of confidence in the result."[7] In other words, there is currently no statistical

---

[5] NATIONAL RESEARCH COUNCIL, COMMITTEE ON IDENTIFYING THE NEEDS OF THE FORENSIC SCIENCES COMMUNITY, STRENGTHENING FORENSIC SCIENCE IN THE UNITED STATES: A PATH FORWARD xix (2009) [hereinafter *Strengthening Forensic Science*].

[6] The report comprehensively reviewed a range of forensic analyses, including toolmark and firearms identification, and made a number of recommendations "to improve the forensic science disciplines and to allow the forensic science community to serve society more effectively." *Id*. at xix, 1-2.

[7] More generally, the NRC Committee observed that "[w]ith the exception of nuclear DNA analysis . . . no forensic method has been rigorously shown to have the capacity to consistently, and with a high degree of certainty, demonstrate
(continued…)

basis to declare with any degree of certainty that toolmarks on a bullet connect that bullet to a particular gun or "match" the markings on other bullets fired from that gun.[8]

---

(…continued)

a connection between evidence and a specific individual or source." *Id*. at 7. With respect to these other forensic analyses, the NRC Committee stated that "[a] body of research . . . to establish the limits and measures of performance and to address the impact of sources of variability and potential bias . . . is sorely needed, but it seems to be lacking in most of the forensic disciplines that rely on subjective assessments of matching characteristics." *Id*. at 8. The NRC Committee called for the development of "rigorous protocols to guide these subjective interpretations and pursue equally rigorous research and evaluation programs." *Id*. The NRC Committee particularly recommended that "[f]orensic reports, and any courtroom testimony stemming from them, must include clear characterizations of the limitations of the analyses, including measures of uncertainty in reported results and associated estimated probabilities where possible." *Id*. at 21-22.

[8] Thus, even the policy the government endorsed in *Jones*, permitting firearms and toolmark examiners to testify to "a reasonable degree of scientific certainty," is an inadequate limitation on firearms and toolmark examiners' testimony. *See* Brief for Appellee at 36, *Jones v. United States*, 27 A.3d 1130 (D.C. 2011) (No. 08-CF-716). This phrase "has no scientific meaning." Paul C. Giannelli, *Reasonable Scientific Certainty: A Phrase in Search of a Meaning*, 25 CRIM. JUST. 40, 40-41 (2010-2011); *see also* NATIONAL INSTITUTE OF STANDARDS AND TECHNOLOGY, EXPERT WORKING GROUP ON HUMAN FACTORS IN LATENT PRINT ANALYSIS, LATENT PRINT EXAMINATION AND HUMAN FACTORS: IMPROVING THE PRACTICE THROUGH A SYSTEMS APPROACH 119 (2012) ("Outside the courtroom . . . scientists do not communicate their findings in this fashion . . . there is no generally accepted or working definition of a 'reasonable degree of certainty' in scientific discourse."). Meanwhile "[i]ts legal meaning is at best ambiguous, at worst misleading." Giannelli, *supra* at 41. "A reasonable degree of scientific certainty" unquestionably implies a data-based foundation for a conclusion that is objectively unfounded.

To adequately account for the current limitations of toolmark analysis, at least one federal district court has ruled that an examiner cannot "claim that he

(continued…)

Against this backdrop, there is only one permissible answer to the question left undecided in *Jones* regarding firearms and toolmark examiners' assertions of certainty in their pattern-matching conclusions:  the District of Columbia courts should not allow them.  It is well established that expert opinion evidence is admissible if "it will not mislead the jury and will prove useful in understanding the facts in issue."  *Clifford v. United States*, 532 A.2d 628, 632 (D.C. 1987) (citing *Dyas v. United States*, 376 A.2d 827, 831 (D.C. 1977)); *cf. Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 589 (1993) ("[T]he trial judge must ensure that any and all scientific testimony or evidence admitted is not only relevant, but reliable.").  Certainty statements such as those elicited by the government in this case are misleading  and lack any legitimate utility in criminal trials; they express a solid statistical foundation for individualization that does not currently (and may never) exist.

The government states in its brief to this court that it is "regrettable" that its expert was permitted to state his pattern-matching conclusion with absolute certainty.  It is more than regrettable.  It is alarming.  We know that faulty forensic

---

(…continued)
reached his conclusions to any degree of 'certainty.'" *Glynn*, 578 F. Supp. 2d at 569.  Another federal district court has limited an examiner's testimony to a report of observed similarities and has declined to allow the examiner to testify as to any conclusion of a match.  *See Green*, 405 F. Supp.2d at 108 & n.3, 123-24.

evidence, and in particular, objectively unfounded statements of certainty regarding forensic analysis, can contribute to wrongful convictions. *See Strengthening Forensic Science*, *supra* note 5, at 45; Brandon L. Garrett, *Judging Innocence*, 108 COLUM. L. REV. 55, 83-84 (2008).

Take the case of Donald Gates, who was wrongfully convicted of rape and murder and needlessly served twenty-seven years in prison.[9] To persuade a jury of Mr. Gates's guilt, the government relied on the similarly subjective pattern-matching analysis of hair evidence. The hair examiner in Mr. Gates's case testified with only slightly more restraint than the firearms and toolmark examiner in this case, acknowledging that "it cannot be said that a hair came from one person to the exclusion of all others," but nonetheless asserting that it was "'highly unlikely' that the hair found on the victim came from someone other than [Mr. Gates]." Brief for Appellee at 8, *Donald E. Gates v. United States*, 481 A.2d 120 (1984) (No. 82-

---

[9] This miscarriage of justice was costly to the District of Columbia. Mr. Gates recently received $16.65 million from the District to settle his civil suit. Spencer S. Hsu, *District to Pay $16.65 Million to Wrongly Imprisoned Man, Attorneys Say*, WASH. POST, Nov. 19, 2015, https://www.washingtonpost.com/local/public-safety/district-to-pay-1665-million-to-wrongly-imprisoned-man-attorneys-say/2015/11/19/2f62fd58-8ecf-11e5-baf4-bdf37355da0c_story.html.

1529) (transcript citations omitted). But, just as in this case, there was no data-based foundation for the expert's expression of certainty in his opinion.[10]

The use of these subjective certainty statements not only implicates the government's "duty to refrain from improper methods calculated to produce a wrongful conviction,"[11] it also calls into question the "fairness, integrity [and]

---

[10] *See Strengthening Forensic Science*, *supra* note 5, at 160-61. The government later "acknowledged" that the hair examiner in Mr. Gates's case "offered unfounded testimony at trial that exaggerated the probative value of the hair match." Letter from Lee F. Satterfield, Chief Judge, Superior Court of the District of Columbia to Avis E. Buchanan and Ronald C. Machen Jr., (Jan. 11, 2011) (quoting Letter from Michael T. Ambrosino, Counsel to the United States Attorney, to Chief Judge Satterfield, n.3 (Nov. 15, 2010)) available at http://www.dccourts.gov/internet/documents/OIGReportLetterFromChiefJudgeSatt erfield.pdf.

[11] *Berger v. United States*, 295 U.S. 78, 88 (1935). Under *Napue v. Illinois*, 360 U.S. 264 (1959), the government may not knowingly present false or misleading evidence or allow admission of such evidence to go uncorrected. *Longus v. United States*, 52 A.3d 836, 847-48 (D.C. 2012); *see also id*. at 847 (explaining that the "underlying purpose of *Napue*" is "to ensure the jury is not misled by falsehoods"). "[A]s with *Brady*, the government's obligation under *Napue* turns not on the personal knowledge of an individual prosecutor, but on what the 'government,' under a collective knowledge theory, knew or should have known." *Id*. at 848. The government's policy regarding firearms and toolmark matching testimony indicates that the government, collectively, knew that the certainty statements of the expert in this case had no foundation and would only mislead the jury to think that the government's case was stronger than it actually was.

public reputation of judicial proceedings."[12] Courts are our society's chosen forum for ascertaining guilt in criminal cases. Our justice system can only function if it maintains the trust of the community. We rely on judges—as the umpires in our adversarial system—to prohibit the admission of evidence that is clearly without foundation. As matters currently stand, a certainty statement regarding toolmark pattern matching has the same probative value as the vision of a psychic: it reflects nothing more than the individual's foundationless faith in what he believes to be true. This is not evidence on which we can in good conscience rely, particularly in criminal cases, where we demand proof—*real* proof—beyond a reasonable doubt, precisely because the stakes are so high. To uphold the public's trust, the District of Columbia courts must bar the admission of these certainty statements, whether or not the government has a policy that prohibits their elicitation. We cannot be complicit in their use.

---

[12] *Puckett v. United States*, 556 U.S. 129, 135 (2009) (quoting *United States v. Olano*, 507 U.S. 725, 736 (1993)).